# In the Matter of the APPLICATION OF THE PACIFIC RAILWAY COMMISSION, etc.

(*Circuit Court, N. D. California.* August 29, 1887.)

1. CONSTITUTIONAL LAW—JUDICIAL POWERS—PACIFIC RAILWAY COMMISSION.
The Pacific Railway Commission is not a judicial body, and possesses no judicial powers under the act of congress of March 3, 1887, creating it, and can determine no rights of the government, or of the corporations whose affairs it is appointed to investigate.

2. SAME—POWER OF CONGRESS—PRODUCTION OF PRIVATE PAPERS.
Congress cannot compel the production of private books and papers of citizens for its inspection, except in the course of judicial proceedings, or in suits instituted for that purpose, and then only upon averments that its rights in some way depend upon evidence therein contained.

3. UNITED STATES—POWER TO SUE—COURTS.
The courts are open to the United States as to private parties to secure protection for their legal rights and interests, by regular proceedings.

4. CONSTITUTIONAL LAW—POWER OF CONGRESS—INVESTIGATION BY COMMISSION.
Congress cannot empower a commission to investigate the private affairs, books, and papers of the officers and employes of corporations indebted to the government, as to their relations to other companies with which such corporations have had dealings, except so far as such officers and employes are willing to submit the same for inspection; and the investigation of the Pacific Railway Commission into the affairs of officers and employes of the Pacific Railway Companies under the act of March 3, 1887, is limited to that extent.

5. SAME—EXPENDITURES OF CENTRAL PACIFIC RAILROAD COMPANY.
The United States have no interest in expenditures of the Central Pacific Railroad Company under vouchers which have not been charged against the government in the accounts between them; and the Pacific Railway Commission under the act of congress of March 3, 1887, has no power to investigate such expenditures against the will of the company and its officers.

6. SAME—JUDICIAL POWERS.
The judicial power of the United States is limited to "cases" and "controversies" enumerated in article 3, § 1, Const., as modified by the eleventh amendment, and to petitions on *habeas corpus*, and cannot be extended by congress; and by such "cases" and "controversies" are meant the claims of litigants brought for determination by regular judicial proceedings established by law or custom.

7. SAME—LEGISLATIVE POWER—INVESTIGATIONS—COURTS.
The judicial department is independent of the legislative, in the federal government, and congress cannot make the courts its instruments in conducting mere legislative investigations.

8. SAME.
The power of the United States courts to authorize the taking of depositions on letters rogatory from courts of foreign jurisdictions exists by international comity; but no comity of any kind can be invoked by a mere investigating committee appointed by congress.

9. CENTRAL PACIFIC RAILROAD COMPANY—STATE CORPORATION—FEDERAL CONTROL.
The Central Pacific Railroad Company is a state corporation, not subject to federal control, any further than a natural person similarly situated would be. Per SAWYER, J.

10. SAME—LAND GRANTS—BONDS FROM GOVERNMENT.
The Central Pacific Railroad Company is absolute owner of the lands and bonds granted to it by the government, having complied with the act making

the grant, subject to the lien of the government to secure its advances, in the same way and to the same extent as a natural person in like situation. Per SAWYER, J.

11. SAME—RELATION TO UNITED STATES—DEBTOR AND CREDITOR.

The relation of creditor and debtor exists between the United States and the Central Pacific Railroad Company, under the act granting aid to the latter, with like force and effect as if both were natural persons, the relation being private, and having nothing to do with the power of the government as sovereign. Per SAWYER, J.

12. SAME—INVESTIGATION BY UNITED STATES.

The United States, as creditor, cannot institute a compulsory investigation into the private affairs of the Central Pacific Railroad Company, or require it to exhibit its books and papers for inspection in any other way, or to any greater extent, than would be lawful in the case of private creditors and debtors. Per SAWYER, J.

13. SAME—JUDICIAL PROCEDURE—LEGISLATIVE COMMISSION.

The United States, as creditor, have the same remedy as a private creditor, and no other, to compel payment of any moneys due them from the Central Pacific Railroad Company, as their debtor, or to prevent the latter from wasting its assets before the debt matures, and that remedy, if any, must be by a regular judicial proceeding in due course of law, and congress has no power to institute a roving, legislative inquisition into the affairs of the company to ascertain what it has done or is doing with its money. Per SAWYER, J.

*(Syllabus by the Court.)*

This is an application of the Pacific Railway Commission, created under the act of congress of March 3, 1887, "Authorizing an investigation of the books, accounts, and methods of railroads which have received aid from the United States, and for other purposes," for an order requiring a witness before it to answer certain interrogatories propounded to him. That act authorizes the president to appoint three commissioners to examine the books, papers, and methods of all railroad companies which have received aid in bonds from the government, and in terms invests them with power to make a searching investigation into the working and financial management, business, and affairs of the aided companies; and also to ascertain and report "whether any of the directors, officers, or employes of said companies, respectively, have been, or are now, directly or indirectly, interested, and to what amount or extent, in any other railroad, steam-ship, telegraph, express, mining, construction, or other business company or corporation, and with which any agreements, undertakings, or leases have been made or entered into; what amounts of money or credit have been loaned by any of said companies to any person or corporation; what amounts of money or credit have been or are now borrowed by any of said companies, giving names of lenders and the purposes for which said sums have been or are now required; what amounts of money or other valuable consideration, such as stocks, bonds, passes, and so forth, have been expended or paid out by said companies, whether for lawful or unlawful purposes, but for which sufficient and detailed vouchers have not been given or filed with the records of said company; and, further, to inquire and report whether said companies, or either of them, or their officers or agents, have paid any money or other valuable consideration, or done any other act or thing, for the purpose of influencing legislation."

It is difficult to express in general terms the extent to which the commissioners are required to go in their inquisition into the business and affairs of the aided companies; or the extent to which they may not go into other business and affairs of its directors, officers, and employes. The act itself must be read to form any conception of the all-pervading character of the scrutiny it exacts of them. And it provides that the commissioners, or either of them, shall have the power "to require the attendance and testimony of witnesses, and the production of all books, papers, contracts, agreements, and documents relating to the matter under investigation, and to administer oaths; and to that end may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses, and the production of books, papers, and documents." And it declares that "any of the circuit or district courts of the United States within the jurisdiction of which such inquiry is carried on, may, in case of contumacy or refusal to obey a subpœna issued to any person, issue an order requiring any such person to appear before said commissioners, or either of them, as the case may be, and produce books and papers, if so ordered, and give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof." And also that "the claim that any such testimony or evidence may tend to criminate the person giving such evidence, shall not excuse such witness from testifying, but such evidence or testimony shall not be used against such person on the trial of any criminal proceeding."

In the discharge of the duties imposed upon them, the commissioners have attended at San Francisco, and called before them as a witness Leland Stanford, who is now, and has been from its organization, president of the Central Pacific Railroad Company, one of the companies which received aid in bonds from the government; and on the tenth of August, while he was under examination respecting the affairs of that company, a number of vouchers purporting to represent the expenditure of moneys belonging to it were produced and verified. These vouchers, as stated by the commissioners, represented the aggregate sum of $733,-725.68, which had been expended by Mr. Stanford between November 9, 1870, and December 21, 1880, and by him charged to the company, and by the company subsequently reimbursed to him. The persons to whom the moneys were paid, and the objects to which they had been applied, do not appear upon the face of the vouchers, except that the objects are stated to have been for "general expense account," or for "legal services," and except, also, that in a few instances the initials of persons to whom the money is purported to have been paid are given. One of the vouchers (No. 2,569½) represented the expenditure of $171,781.89. It reads as follows:

C. P. R. R. Co. to Leland Stanford, *Dr.*

| | |
|---|---|
| To cash paid on account of general expenses to December 31, 1875, | $137,365 50 |
| To cash paid on account of general expenses to December 31, 1875, | 34,416 39 |
| | $171,781 89 |

This was indorsed, in addition to its number, amount, and a statement of its general character, as follows:

"Allowed February 7, 1876, by board of directors, folio 153.
"I certify that the within account, amounting to $171,781.89, is correct.
"LELAND STANFORD."

When under examination Mr. Stanford was asked to explain in detail the character of the expenditures covered by this voucher, he replied that he had no recollection of its contents, but presumed it was made up of many items. He then proceeded to explain at great length the manner in which he did business for the company in negotiating loans and incurring expenditures, which was briefly this: The loans were generally negotiated in San Francisco, and the payment of expenses incurred by him was frequently made there, though for many years the office of the company was at Sacramento. His payments were usually in checks drawn in his own name. The check-books, with loose *memoranda* kept by him, were handed from time to time to some one connected with the office, by whom a general voucher was made up embracing the several expenditures incurred, and the voucher was then presented by the witness to the directors of the company, and by them approved. The witness kept no accounts of his several expenditures, except loose *memoranda* and his check-books, from which the vouchers were made up; and he supposed the voucher in question was thus made up. He could not, at that date, state the items which made up the several accounts, but he had no doubt that he explained the matter to the company when the voucher was presented. To the question, "What explanation did you give the company?" the witness answered as follows: "Well, as I do not remember the items of it, I cannot remember, of course, what explanation I may have given to the company. I don't think I went into details of these things to the company, further than to say I found it necessary to expend for the general interest of the company so much; and I do not think that they ever questioned me particularly as to the wisdom of the expenditure."

The commission then asked the witness this question: "Was any part of the $171,000 (the sum named in this bill that I have handed to you, and that you have) paid for the purpose of influencing legislation?" The counsel present acting for the railroad company objected to the question, for the reason that the witness had said that he did not remember what constituted the items composing the voucher; and stated that upon that point (of influencing legislation) any question the commission has asked, or might be disposed to ask, the witness would be advised not to answer, upon the ground that the company is willing to account to the government for its proportion of any voucher that is produced, or of any entry upon the books of the company that is unexplained, and therefore it will not make any difference what is done with the money,—whether it was thrown into the sea, or wasted in any manner or form. The chairman of the commission repeated the question in a modified form as follows: "Was any part of the sum named in the voucher submitted to you

paid to any agent or individual for the purpose of influencing legislation?" To this the witness answered as follows: "I told you I did not know anything about this, but then I shall act upon the advice of my counsel. I don't suppose it can make any possible difference as long as we account for the money. If the government is not satisfied with the vouchers which we present, whether the money was expended or wasted, or anything of the kind, it can make no possible difference, because, if it went into the sea, if I had used this money improperly or thrown it away, I might be accountable to the stockholders for my trust; but the government cannot have any more than the money, and the company is willing to account for that if you are not satisfied with the action." The witness, therefore, under advice of counsel, declined to give any further answer.

The chairman also asked this question: "Are you able to state to the commission that any of the money was paid for illegitimate or corrupt purposes; that is, to corrupt the legislature of the state of California, or any other state legislature, or the congress of the United States?" and to which the witness answered as follows: "I have told you what I know, that I do not remember about that account; but I can say this: that I never corrupted a member of the legislature in my life, and I do not know that any of my agents ever did. So far as congress is concerned, I saw a statement that the board of directors allowed my account for expenditures made in Washington or in various places. I do not know that I ever had any occasion to pay out any money at Washington except for my own private expenses."

The witness, upon further examination, testified that his check-books in which he drew his checks for the expenditures were destroyed; that it had always been his habit about once a year to have a "clean up;" and when he wanted to go away he would overhaul his papers, and what he did not want he would destroy; that he had been to Europe three times within the last few years, and each time he had "cleaned up," leaving only such papers as, in case he might not return, he was willing that other people might see.

Notwithstanding the answer of the witness that he could not state the items of the voucher, and had no recollection of any of them, he was repeatedly asked substantially the same question, as though by its repetition a different answer might be obtained. The answer was, however, substantially the same in every instance. Other vouchers of a similar kind presented by the witness to the company were produced and verified, and with respect to them the witness said as follows: "I suggest to the commission that there is not in all that class of bills to-day a single item that I positively remember. I could not tell the amount, nor when these bills were credited, excepting I went to the books. I cannot tell of a single item that went to make up the amounts. Let my answer as to this and to the other vouchers of that class be the same as I have made to the other (the first) voucher; and I will take that position generally." Yet the commissioners felt it their duty to ask specifically as to each voucher substantially the same question, at which some feeling ap-

pears to have been excited, as the following passage from the examination upon one of the vouchers discloses:

"*Chairman of the Commission.* Was any part of the sum expended through any agent or individual for the purpose of influencing legislation? *Answer.* Not to my knowledge. I have told you already. I do not know the object of your examining me in this way. I have told you that I do not know anything about it, and I have told you that, I think, three or four times. *The Chairman.* I want you to distinctly understand that I am going to ask you as to each of these vouchers, and I will put it on the record. *The Witness.* And I want you to distinctly understand that I shall exercise my discretion about it. *The Chairman.* That is your right, and it is my right and duty, sworn to, to ask you. *The Witness.* It is your right and your duty to be a gentleman in asking questions. *The Chairman.* Well, if I have not been, I will apologize. *The Witness.* Well, I think you have occasion to apologize for asking such questions as that over and over again. *The Chairman.* I will repeat my question, and you can decline just as you have done. I am going through all of these vouchers just in this way, so that there will be no mistake in the future."

The commissioners now ask in their petition that the witness be summoned to show cause why he should not be required to answer the interrogatories whether any part of the sums named in the several vouchers was paid for the purpose of influencing legislation, which he has declined to do except in the manner stated.

Subsequently, interrogatories were propounded to Mr. Stanford inquiring whether any portion of the moneys covered by the several vouchers produced, following the first one, was paid to certain parties, who were named, for the purpose of using the same in connection with measures pending in the legislature. The witness declined to answer these interrogatories, and the commissioners also ask in their petition that he be summoned to show cause why he should not be required to answer them.

It was also in evidence before the commission that in December, 1875, the legislature of California was in session in the city of Sacramento, and that it was the custom of the railroad company to be represented before its committees. The commission thereupon inquired as follows:

"*The Chairman.* How many representatives did you have there? *Answer.* I used to generally go there and spend a good deal of time when there was any very hostile legislation going on or proposed. I was up there, and sometimes had one of our people, and sometimes another,—sometimes one lawyer, and sometimes another. *The Chairman.* Please name the lawyers who were in the habit of attending the legislature with you. *A.* Unless it is really necessary, I do not want to go into the detail of anything of that kind. We often employed agents in a confidential character, and it was not advisable that others should know that they were in our service. I do not want to answer unless I am compelled to answer. I want to give you all the information that it is in our power, by which you may understand under what obligations we are to the government. If we have wrongfully disposed of any of the assets of the Central Pacific Company that could possibly affect its relation with the government, I want you to know it; but where it is a matter merely between myself and my stockholders and directors, and it cannot make any difference in our relations to the government, or what the government may want

to claim because of the lack of proper vouchers upon which to base their five or twenty-five per cent., I do not want to do it. I cannot conceive that the questions you are asking me can possibly affect our account with the government as long as we are willing to pay. If you are not satisfied with these vouchers, we say to you, say so, and we will account for them as money on hand."

To the question subsequently repeated the witness declined to answer, and the commissioners pray in their petition that the witness also be required by order of the court to show cause why he shall not be required to answer this interrogatory. Upon the filing of the petition, which was signed and verified by the oath of the commissioners, an order was entered as prayed that the witness show cause before the court, on a day designated, why he should not be required to appear before them and answer the interrogatories propounded.

The witness appeared in response to the order, and filed his answer to the petition, in which he gives at some length the history of the construction of the road of the company, and of the difficulties its projectors had to encounter, and mentions the aid in bonds and lands received from the government, and the annual reports made to the secretary of the treasury of its condition and management. He states that since its organization in June, 1861, he has been its president, and, after describing the manner of doing business, adds:

"In this way I have taken part in transacting the business of the company for a period now extending over (25) twenty-five years, and in point of value aggregating upwards of four hundred millions of dollars. As the business took place I was cognizant of it; but owing to its multiplicity, and the pressure of matters more important than mere detail, as well as the lapse of time, I am now no longer able to recall many of the matters with which I was personally so familiar."

He also states that by the decision of the supreme court the relation between the United States and the railroad company is that of creditor and debtor, and that the rights of both are those springing from that relation; that the examination made by the commission has not only extended to the affairs of the Central Pacific Railroad Company, but has extended to a searching investigation of the affairs of all the consolidated and allied companies connected with that corporation; and that their affairs have been examined into, not only by the experts of the commission, but the commissioners themselves, and their business relations have been exposed to the public and the prying curiosity of rival business competitors; and that the commission insists upon investigating matters with which the government has and can have no possible concern; that the disposition the company may have made of such portion of its assets or earnings as the government has not and never had any interest in is of this character; and yet the commission insists upon answers to questions respecting such disposition which can have no possible effect upon the relations between the company and the government, and can only tend to cast suspicion upon parties whose names may be mentioned; and as the subjects in respect to which these questions

are propounded are of an exclusively private character, in no way affecting the interests of the government, neither the company nor its officers feel called upon to answer.

The respondent also makes the extraordinary statement that he is constrained to this course "as the gentlemen of the commission have distinctly and repeatedly avowed, in the course of their examination, that they do not regard themselves bound in such examination by the ordinary rules of evidence; that they would receive hearsay and *ex parte* statements, surmises, suspicions, and all character of information that might be called to their attention;" and that, during the course of his examination, it had more than once transpired that he was examined upon charges made in pleadings and proceedings instituted against the company based upon suspicion and surmises, and in many cases without actual foundation; that questions had been propounded, and a line of examination pursued manifestly prompted by disaffected and hostile parties, whose aim was more the pursuit of personal enmity of a private character than the interests of the public at large or the ends of justice; that to answer any of the objectionable questions would necessarily give rise to the implication that all persons whose names may be mentioned in the questions to which answers are declined are guilty of the acts of commission which is implied in the bare asking of the questions; that in his testimony he had said in substance, and now repeats it, that he never corrupted, or attempted to corrupt, any member of the legislature, or any member of congress, or any public official, and never authorized any agent to do so; that all the claims covered by the vouchers referred to have received, not only the approval of the board of directors of the Central Pacific Railroad Company, but likewise the approval of the stockholders of that company; that all parties who could in anywise legally or equitably be affected by the disbursements embraced in them were fully satisfied therewith, and have ratified and approved of the same.

And in addition the respondent states that in the conduct and management of a business of the magnitude of the Central Pacific Railroad Company, and the various corporations consolidated and allied therewith, it is impossible not from time to time to have to do business involving disbursements which every dictate of business prudence will not admit of being made public; that arrangements of a private character, names of parties not publicly known, and the disclosures of which could only result in defeating the ends in view, and exposing the persons so named to suspicion and obloquy, would forbid making the same public, either upon the archives of the company, or before a public commission; that this course of policy is not only sanctioned by ordinary experience in business life, but the government of the United States and the government of the state of California, as well as the government of the city and county of San Francisco, severally, allow to their chief magistrates money, the investment of which is committed exclusively to their judgment and discretion, and for which detailed vouchers are never required.

The respondent further adds that the commission deemed it its duty to propound questions involving criminality on his part, and on the part of the persons whose names were mentioned in such questions, answers to which, for the reasons stated, he has felt constrained to decline to make; that, acting not only on his own behalf, but on behalf of those whose interests as stockholders of the Central Pacific Railroad Company are committed to his charge, he feels bound to decline to answer them unless by the court he is otherwise directed.

The purport of the answer of the respondent is that the government has no legal interest in the matters in relation to which the interrogatories are propounded; that he has answered the interrogatories so far as it was in his power to do so, not having any recollection of the items for which the vouchers were made up, at this distant day from the transactions to which they relate; and that he is shielded by the constitution from answering questions implying criminality in his conduct, and calculated to cast aspersions upon others.

The district attorney of the United States, acting for the commissioners, moves for a peremptory order upon the witness to compel him to answer the interrogatories, notwithstanding his answer to the order to show cause.

*T. I. Bergin* and *L. D. McKisick*, for Leland Stanford.

*John T. Carey*, U. S. Dist. Atty., and *Henry C. McPike*, Asst. U. S. Dist. Atty., for the Railway Commission.

FIELD, Circuit Justice, after filing the above statement of facts, delivered the opinion of the court, as follows:

The motion for a peremptory order upon the witness to answer the interrogatories propounded by the railway commission has been fully argued; and everything which could be said in its favor has been ably presented by the United States attorney, either in oral or printed arguments. In resisting the motion, counsel of the respondent have not confined themselves to a discussion of the propriety and necessity of the interrogatories, and the sufficiency of the answers given by him; but they have assailed the validity of the act creating the commission, so far as it authorizes an examination into the private affairs of the directors, officers, and employes of the Central Pacific Railroad Company, and confers the right to invoke the power of the federal courts in aid of the general investigation directed. Impressed with the gravity of the questions presented, we have given to them all the consideration in our power.

The Pacific Railway Commission, created under the act of congress of March 3, 1887, is not a judicial body; it possesses no judicial powers; it can determine no rights of the government, or of the companies whose affairs it investigates. Those rights will remain the subject of judicial inquiry and determination as fully as though the commission had never been created; and in such inquiry its report to the president of its action will not be even admissible as evidence of any of the matters investigated. It is a mere board of inquiry, directed to obtain information upon certain matters, and report the result of its investigations to the president, who is to lay the same before congress. In the progress of its

investigations, and in the furtherance of them, it is in terms authorized to invoke the aid of the courts of the United States in requiring the attendance and testimony of witnesses, and the production of books, papers, and documents. And the act provides that the circuit or district court of the United States, within the jurisdiction of which the inquiry of the commission is had, in case of contumacy or refusal of any person to obey a subpœna to him, may issue an order requiring such person to appear before the commissioners, and produce books and papers, and give evidence touching the matters in question.

The investigation directed is to be distinguished from the inquiries authorized upon taking the census. The constitution provides for an enumeration of the inhabitants of the states at regular periods, in order to furnish a basis for the apportionment of representatives, and, in connection with the ascertainment of the number of inhabitants, the act of congress provides for certain inquiries as to their age, birth, marriage, occupation, and respecting some other matters of general interest, and for a refusal of any one to answer them a small penalty is imposed. Rev. St. § 2171. There is no attempt in such inquiries to pry into the private affairs and papers of any one, nor are the courts called upon to enforce answers to them. Similar inquiries usually accompany the taking of a census of every country, and are not deemed to encroach upon the rights of the citizen. And in addition to the inquiries usually accompanying the taking of a census, there is no doubt that congress may authorize a commission to obtain information upon any subject which, in its judgment, it may be important to possess. It may inquire into the extent of the productions of the country of every kind, natural and artificial, and seek information as to the habits, business, and even amusements of the people. But in its inquiries it is controlled by the same guards against the invasion of private rights which limit the investigations of private parties into similar matters. In the pursuit of knowledge it cannot compel the production of the private books and papers of the citizen for its inspection, except in the progress of judicial proceedings, or in suits instituted for that purpose, and in both cases only upon averments that its rights are in some way dependent for enforcement upon the evidence those books and papers contain.

Of all the rights of the citizen, few are of greater importance or more essential to his peace and happiness than the right of personal security, and that involves, not merely protection of his person from assault, but exemption of his private affairs, books, and papers from the inspection and scrutiny of others. Without the enjoyment of this right, all other rights would lose half their value. The law provides for the compulsory production, in the progress of judicial proceedings, or by direct suit for that purpose, of such documents as affect the interest of others, and also, in certain cases, for the seizure of criminating papers necessary for the prosecution of offenders against public justice, and only in one of these ways can they be obtained, and their contents made known, against the will of the owners.

In the recent case of *Boyd* v. *U. S.*, 116 U. S. 616, 6 Sup. Ct. Rep. 524, the supreme court held that a provision of a law of congress, which

authorized a court of the United States in revenue cases, on motion of the government attorney, to require the defendant or claimant to produce in court his private books, invoices, and papers, or that the allegations of the attorney respecting them should be taken as confessed, was unconstitutional and void as applied to suits for penalties or to establish a forfeiture of the party's goods. The court, speaking by Mr. Justice BRADLEY, said:

"Any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime or to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purpose of despotic power; but it cannot abide the pure atmosphere of political liberty and personal freedom."

The language thus used had reference, it is true, to the compulsory production of papers as a foundation for criminal proceedings, but it is applicable to any such production of the private books and papers of a party otherwise than in the course of judicial proceedings, or a direct suit for that purpose. It is the forcible intrusion into, and compulsory exposure of, one's private affairs and papers, without judicial process, or in the course of judicial proceedings, which is contrary to the principles of a free government, and is abhorrent to the instincts of Englishmen and Americans.

In his opinion in the celebrated case of *Entick* v. *Carrington*, reported at length in 19 How. State Tr. 1029, Lord CAMDEN said:

"Papers are the owner's goods and chattels; they are his dearest property, and are so far from enduring a seizure that they will hardly bear an inspection; and though the eye cannot, by the laws of England, be guilty of a trespass, yet, where papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect. Where is the written law that gives any magistrate such a power? I can safely answer there is none; and therefore it is too much for us, without such authority, to pronounce a practice legal which would be subversive of all the comforts of society."

Compulsory process to produce such papers, not in a judicial proceeding, but before a commissioner of inquiry, is as subversive of "all the comforts of society" as their seizure under the general warrant condemned in that case. The principles laid down in the opinion of Lord CAMDEN, said the supreme court of the United States, "affect the very essence of constitutional liberty and security. They reach further than the concrete form of the case then before the court with its adventitious circumstances; they apply to all invasions on the part of the government, and its employes, of the sanctity of man's home and the privacies of life."

In *Kilbourn* v. *Thompson*, 103 U. S. 168, we have a decision of the supreme court of the United States that neither house of congress has the power to make inquiries into the private affairs of the citizen; that is, to compel exposure of such affairs. That case was this: The firm of Jay Cooke & Co. were debtors of the United States, and it was alleged that they were interested in a "real-estate pool" in the city of Washington, and that the trustee of their estate and effects had made a settlement of their interests with the associates of the firm to the disadvan-

tage and loss of numerous creditors, including the government of the United States. The house of representatives, by a resolution reciting these facts, authorized the speaker to appoint a committee of five to inquire into the matter and history of said "real-estate pool," and the character of the settlement, with the amount of the property involved, in which Jay Cooke & Co. were interested, and the amount paid, or to be paid, in said settlement, with power to send for persons and papers, and report to the house. The committee was appointed and organized, and proceeded to make the inquiry directed. A subpœna was issued to one Kilbourn, commanding him to appear before the committee to testify and be examined touching the matters to be inquired into, and to bring with him certain designated records, papers, and maps relating to the inquiry. Kilbourn appeared before the committee, and was asked to state the names of the five members of the real-estate pool, and where each resided, and he refused to answer the question, or to produce the books which had been required. The committee reported the matter to the house, and it ordered the speaker to issue his warrant directed to the sergeant-at-arms to arrest Kilbourn, and bring him before the bar of the house to answer why he should not be punished for contempt. On being brought before the house, Kilbourn persisted in his refusal to answer the question, and to produce the books and papers required. He was thereupon held to be in contempt, and committed to the custody of the sergeant-at-arms until he should signify his willingness to appear before the committee and answer the question and obey the *subpœna duces tecum;* and it was ordered that in the mean time the sergeant-at-arms should cause him to be confined in the common jail of the District of Columbia. He was accordingly confined in that jail for 45 days, when he was released on *habeas corpus* by the chief justice of the supreme court of the District of Columbia. Upon his release he sued the speaker of the house, the members of the committee, and the sergeant-at-arms for his forcible arrest and confinement. The defendants pleaded the facts recited, to which plea the plaintiff demurred. The demurrer was overruled, and judgment ordered for the defendants. On a writ of error to the supreme court the judgment was affirmed as to all the defendants except the sergeant-at-arms. They, being members of the house, were held to be protected from prosecution for their action. But, as to Thompson, the judgment was reversed, and the cause remanded for further proceedings. In the supreme court the questions involved received great consideration; and it was held that the subject-matter of the investigation was judicial, and not legislative, and that there was no power in congress, or in either house, on the allegation that an insolvent debtor of the United States was interested in a private business partnership, to investigate the affairs of that partnership, and, consequently, no authority to compel a witness to testify on the subject.

"The house of representatives," said the court, "has the sole right to impeach officers of the government, and the senate to try them. Were the question of such impeachment before either body acting in its appropriate sphere on that subject, we see no reason to doubt the right to

compel the attendance of witnesses, and their answer to proper questions, in the same manner and by the use of the same means that courts of justice can in like cases. Whether the power of punishment in either house by fine or imprisonment goes beyond this or not, we are sure that no person can be punished for contumacy as a witness before either house, unless his testimony is required in a matter into which that house has jurisdiction to inquire, *and we feel equally sure that neither of these bodies possesses the general power of making inquiry into the private affairs of the citizen.*" And again: "If the investigation which the committee was directed to make was judicial in its character, and could only be properly and successfully made by a court of justice, and if it related to a matter wherein relief or redress could be had only by a judicial proceeding, we do not, after what has been said, deem it necessary to discuss the proposition that the power attempted to be exercised was one confided by the constitution to the judicial, and not to the legislative, department of the government. *We think it equally clear that the power asserted is judicial, and not legislative.*" And again: "The resolution adopted as a sequence of the preamble contains no hint of any intention of final action by congress on the subject. In all the argument on the case no suggestion has been made of what the house of representatives or the congress could have done in the way of remedying the wrong, or securing the creditors of Jay Cooke & Co., or even the United States. Was it to be simply a fruitless investigation into the personal affairs of individuals? *If so, the house of representatives had no power or authority in the matter more than any other equal number of gentlemen interested for the government of their country.* By fruitless, we mean that it could result in no valid legislation on the subject to which the inquiry referred."

When the case went back to the supreme court of the District of Columbia, and was tried, the plaintiff recovered a verdict for $60,000 against the sergeant-at-arms. A new trial having been granted for excessive damages, the plaintiff recovered on the second trial a verdict for $37,-500. This amount was subsequently reduced to $20,000, which was paid by order of congress, with interest and costs of suit. 23 St. at Large, 467; MacArthur & Mackey, 416, 432.

This case will stand for all time as a bulwark against the invasion of the right of the citizen to protection in his private affairs against the unlimited scrutiny of investigation by a congressional committee. The courts are open to the United States as they are to the private citizen, and both can there secure, by regular proceedings, ample protection of all rights and interests which are entitled to protection under a government of a written constitution and laws.

The act of congress not only authorizes a searching investigation into the methods, affairs, and business of the Central Pacific Railroad Company, but it makes it the duty of the railway commission to inquire into, ascertain, and report whether any of the directors, officers, or employes of that company have been, or are now, directly or indirectly, interested, and to what extent, in any railroad, steam-ship, telegraph, express, mining, construction, *or other business company or corporation*, and with which any

agreements, undertakings, or leases have been made or entered into. There are over 100 officers, principal and minor, of the Central Pacific Railroad Company, and nearly 5,000 employes. It is not unreasonable to suppose that a large portion of these have some interest, as stockholders or otherwise, in some other company or corporation with which the railway company may have an agreement of some kind, and it would be difficult to state the extent to which the explorations of the commission into the private affairs of these persons may not go if the mandate of the act could be fully carried out. But in accordance with the principles declared in the case of *Kilbourn* v. *Thompson*, and the equally important doctrines announced in *Boyd* v. *U. S.*, the commission is limited in its inquiries as to the interest of these directors, officers, and employes in any other business, company, or corporation to such matters as these persons may choose to disclose. They cannot be compelled to open their books, and expose such other business to the inspection and examination of the commission. They were not prohibited from engaging in any other lawful business because of their interest in and connection with the Central Pacific Railroad Company, and that other business might as well be the construction and management of other railroads as the planting of vines, or the raising of fruit, in which some of those directors and officers and employes have been in fact engaged. And they are entitled to the same protection and exemption from inquisitorial investigation into such business as any other citizens engaged in like business.

With reference to the vouchers respecting which the principal interrogatories are propounded, and to which we are asked to compel answers from the witness, it is conceded by the commission on this motion that the moneys covered by them were not charged against the United States in ascertaining the net earnings of the company. If such were the case, it is difficult to see what interest the United States can have in the disposition of those moneys. Be that as it may, the federal courts cannot, upon that concession, aid the commission in ascertaining how the moneys were expended. Those courts cannot become the instruments of the commission in furthering its investigation. Their power, its nature and extent, is defined by the constitution. The government established by that instrument is one of delegated powers, supreme in its prescribed sphere, but without authority beyond it. No department of it can exercise any powers not specifically enumerated or necessarily implied in those enumerated. Such is the teaching of all of our great jurists, and the tenth amendment declares that "the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." Any legislation of congress beyond the limits of the powers delegated is an invasion of the rights reserved to the states or to the people, and is necessarily void. The first section of the third article of the constitution declares that "the judicial power of the United States shall be vested in one supreme court, and such inferior courts as congress may, from time to time, ordain and establish." The second section of the same article declares that "the ju-

dicial power shall extend to all cases, in law and equity, arising under this constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, other public ministers, and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more states; between a state and citizens of another state; between citizens of different states; between citizens of the same state claiming lands under grants of different states; and between a state, or the citizens thereof, and foreign states, citizens, or subjects."

This section was modified by the eleventh amendment, declaring that "the judicial power shall not be construed to extend to any suit, in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." As thus modified, the section states all the cases and controversies in which the judicial power of the United States can be exercised, except those arising on a petition for a writ of *habeas corpus*, which is regarded as a suit for one's personal freedom.[1] The judicial power of the United States is therefore vested in the courts, and can only be exercised by them in the cases and controversies enumerated, and in petitions for writs of *habeas corpus*. In no other proceedings can that power be invoked, and it is not competent for congress to require its exercise in any other way. Any act providing for such exercise would be a direct invasion of the rights reserved to the states or to the people; and it would be the duty of the court to declare it null and void. Story says, in his Commentaries on the Constitution, that "the functions of the judges of the courts of the United States are strictly and exclusively judicial. They cannot, therefore, be called upon to advise the president in any executive measures, or to give extrajudicial interpretations of law, or to act as commissioners in cases of pensions or other like proceedings." Section 1777.

The judicial article of the constitution mentions cases and controversies. The term "controversies," if distinguishable at all from "cases," is so in that it is less comprehensive that the latter, and includes only suits of a civil nature. *Chisholm* v. *Georgia*, 2 Dall. 431, 432; 1 Tuck. Bl. Comm. App. 420, 421. By cases and controversies are intended the claims of litigants brought before the courts for determination by such regular proceedings as are established by law or custom for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs. Whenever the claim of a party under the constitution, laws, or treaties of the United States takes such a form that the judicial power is capable of acting upon it, then it has become a case. The term implies the existence of present or possible adverse parties whose contentions are submitted to the court for adjudication.

[1] NOTE BY THE COURT. Probably the supposed exception stated is not really one; and that cases arising on a petition for a writ of *habeas corpus* are included in those mentioned in the judiciary article. See Louisiana v. U. S., 8 Sup. Ct. Rep. —, decided by the supreme court since this opinion was rendered.

In *Osborn* v. *U. S.*, 9 Wheat. 819, the supreme court, speaking by Chief Justice MARSHALL, after quoting the third article of the constitution declaring the extent of the judicial power of the United States, said:

"This clause enables the judicial department to receive jurisdiction to the full extent of the constitution, laws, and treaties of the United States, when any question respecting them shall assume such a form that the judicial power is capable of acting on it. *That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law.* It then becomes a case, and the constitution declares that the judicial power shall extend to all cases arising under the constitution, laws, and treaties of the United States."

In his Commentaries on the Constitution, Mr. Justice Story says:

"It is clear that the judicial department is authorized to exercise jurisdiction to the full extent of the constitution, laws, and treaties of the United States, whenever any question respecting them shall assume such a form that the judicial power is capable of acting upon it. *When it has assumed such a form, it then becomes a case; and then, and not till then, the judicial power attaches to it.* A case, then, in the sense of this clause of the constitution, arises when some subject touching the constitution, laws, or treaties of the United States is submitted to the courts by a party who asserts his rights in the form prescribed by law."

And Mr. Justice Story refers in a note to the speech of Marshall on the case of Robbins, in the house of representatives, before he became chief justice, which contains a clear statement of the conditions upon which the judicial power of the United States can be exercised. His language was:

"By extending the judicial power to all cases in law and equity, the constitution has never been understood to confer on that department any political power whatever. To come within this description, a question must assume a legal form for forensic litigation and judicial decision. There must be parties to come into court, who can be reached by its process, and bound by its power; whose rights admit of ultimate decision by a tribunal to which they are bound to submit."

The proceedings to obtain testimony upon letters rogatory to be used in the courts of foreign countries is not, as suggested by counsel, an exception to this doctrine. There are certain powers inherent in all courts. The power to preserve order in their proceedings, and to punish for contempt of their authority, are instances of this kind. And by jurists and text writers the power of the courts of record of one country, as a matter of comity, to furnish assistance, so far as is consistent with their own jurisdiction, to the courts of another country, by taking the testimony of witnesses to be used in the foreign country, or by ordering it to be taken before a magistrate or commissioner, has also been classed among their inherent powers. "For by the law of nations," says Greenleaf, "courts of justice of different countries are bound mutually to aid and assist each other, for the furtherance of justice; and hence, when the testimony of a foreign witness is necessary, the court before which the action is pending may send to the court within whose jurisdiction the witness resides a writ, either patent or close, usually termed a letter rogatory, or a commission *sub mutuæ vicissitudinis obtentu ac in juris subsidium*,

from those words contained in it. By this instrument the court abroad is informed of the pendency of the cause, and the names of the foreign witnesses, and is requested to cause their depositions to be taken in due course of law, for the furtherance of justice, '*with an offer on the part of the tribunal making the request to do the like for the other in a similar case.*" Treatise on Evidence, vol. 1, § 320. The comity in behalf of which this power is exercised cannot, of course, be invoked by any mere investigating commission. And it would seem that, by act of congress, the power of the federal courts in this respect has been restricted to cases in which a foreign government is a party or has an interest. Rev. St. § 4071.[1]

The act of congress creating the railway commission in terms provides, as already stated, that it may invoke the aid of any circuit or district court to require the attendance of witnesses, and the production of books, papers, and documents relating to the subject of inquiry; and empowers the court, in case of contumacy or refusal of persons to obey subpœnas to them, to issue orders requiring them to appear before the commissioners, or either of them, and produce the books and papers ordered, and give evidence touching the matters in question, and to punish disobedience to its orders; and does not appear to leave any discretion in the matter with the court. It would seem as though congress intended that the court should make the orders sought upon the mere request of the commissioners, without regard to the nature of the inquiry. It is difficult to believe that it could have intended that the court should thus be the mere executor of the commissioners' will. And yet, if the commissioners are not bound, as they have asserted, by any rules of evidence in their investigations, and may receive hearsay, *ex parte* statements, and information of every character that may be brought to their attention, and the court is to aid them in this manner of investigation, there can be no room for the exercise of judgment as to the propriety of the questions asked, and the court is left merely to direct that the pleasure of the commissioners in the line of their inquiries be carried out. But if

[1] NOTE BY THE COURT. Nor is there anything in the jurisdiction exercised by the United States courts over proceedings of grand juries, or in aid of their deliberations, or in aid of proceedings to perpetuate testimony, which militates against the view taken in the opinion. The judicial power of the courts of the United States extending to the cases and controversies enumerated in the constitution, their jurisdiction necessarily covers all proceedings taken from the formal commencement of such cases and controversies to the execution of the judgments rendered therein. A certain class of offenders can only be prosecuted in the federal courts through the indictment or presentment of a grand jury. Article 5 of Amendments. Over, therefore, the proceedings of such bodies those courts can exercise jurisdiction, and in aid of their deliberations can issue process, and compel the attendance of witnesses, and require them to answer any proper questions propounded to them, and in case of refusal may punish them as for a contempt.

Proceedings to perpetuate testimony, where litigation is expected or apprehended, are within the ordinary jurisdiction of courts of equity, and come under the designation of "cases in equity" in the constitution. The nature and requisites of a bill filed for that purpose are fully described in Story, Eq. Pl. c. 7. It must state the subject in relation to which the plaintiff desires to preserve testimony, in what way he is interested in that subject, the names of the contemplated or apprehended litigants who are named as defendants, and the interests they have in the subject, or claim to have; and a subpœna must be issued thereon and served as in other cases in equity.

it was expected that the court, when its aid is invoked, should examine the subject of the inquiries to see their character, so as to be able to determine the propriety and pertinency of the questions, and the propriety and necessity of producing the books, papers, and documents asked for before the commission, then it would be called upon to exercise advisory functions in an administrative or political proceeding, or to exercise judicial power. If the former, they cannot be invested in the court; if the latter, the power can only be exercised in the cases or controversies enumerated in the constitution, or in cases of *habeas corpus*.

The provision of the act authorizing the courts to aid in the investigation in the manner indicated must therefore be adjudged void. The federal courts, under the constitution, cannot be made the aids to any investigation by a commission or a committee into the affairs of any one. If rights are to be protected or wrongs redressed by any investigation, it must be conducted by regular proceedings in the courts of justice in cases authorized by the constitution.

The inability of the courts of the United States to exercise power in any other than regular judicial proceedings was decided in *Hayburn's Case* as early as 1792. 2 Dall. 409. In March of that year, congress passed an act providing that invalid officers, soldiers, and seamen of the Revolution should be entitled to certain pensions proportionate to the extent of their disability, and devolved upon the circuit court of the United States of the district, where the invalids resided, the duty of examining the proofs presented of the nature and extent of the disability, and of determining what amount of their monthly pay would be equivalent to the disability ascertained, and to certify the same to the secretary of war, who was to place the names of the applicants returned on the pension list of the United States in conformity thereto, unless where he had cause to suspect imposition or mistake, in which case he was authorized to withhold the name of the applicant from the list, and report the same to congress at its next session. 1 St. at Large, 244, §§ 2, 4. Every circuit judge, except one who did not have the question before him, was of opinion that the law was unconstitutional and void. From a statement of Mr. Justice CURTIS, in a note appended to the report of the case, it would seem that the judges were of opinion that the power devolved upon them by the act was not judicial in the sense of the constitution, and, if judicial, that their decisions could not be subject to the revision of the secretary of war, or of the congress of the United States. Plainly, the power exercised by them in determining the extent to which the invalids were entitled to the pensions provided upon the proof produced was in its nature judicial, for it required examination of evidence and judgment thereon; but it was not judicial in the sense of the constitution, under which judicial power can be exercised only in the cases enumerated in that instrument. The judges forwarded their conclusions to President Washington, and the act was subsequently repealed.

A suit being afterwards brought against one Yale Todd to recover back the amount of a pension paid to him, the question of the validity of the act came before the supreme court, and judgment was rendered in favor

of the United States for the money. This case will be found stated at length by Chief Justice TANEY in a note to the report of *U. S.* v. *Ferreira*, 13 How. 52. "This decision," said that great chief justice, "has ever since been regarded as constitutional law, and followed by every department of the government; by the legislative and executive branches, as well as the judiciary." *Gordon* v. *U. S.*, 117 U. S. 697, 703.

The conclusion we have thus reached disposes of the petition of the railway commissioners, and renders it unnecessary to consider whether the interrogatories propounded were proper in themselves, or were sufficiently met by the answers given by Mr. Stanford, or whether any of them were open to objection for the assumptions they made, or the imputations they implied. It is enough that the federal courts cannot be made the instruments to aid the commissioners in their investigations. It also renders it unnecessary to make any comment upon the extraordinary position taken by them according to the statement of the respondent, to which we have referred, that they did not regard themselves bound in their examination by the ordinary rules of evidence, but would receive hearsay and *ex parte* statements, surmises, and information of every character that might be called to their attention. It cannot be that the courts of the United States can be used in furtherance of investigations in which all rules of evidence may be thus disregarded.

The motion of the district attorney for a peremptory order upon the witness to answer the interrogatories as set forth in the petition of the railway commission is therefore denied, and the order to show cause is discharged.

SAWYER, Circuit Judge, (*concurring.*) I fully concur in the reasoning of the circuit justice, and the conclusions reached; but I deem it proper to present some further views in support of our decision.

It is necessary to understand the exact legal relation of the Central Pacific Railroad Company to the United States, in order to, correctly, appreciate the constitutional powers of congress, and of the commission acting under its authority, over it. The Central Pacific Railroad Company is a private corporation, created, and existing under the laws of the state of California. It derived none of its *corporate* faculties, or franchises, from the United States. It is in no way subject to the control, or laws, of the United States, except so far as it is subject to regulation, as an instrument of foreign, or interstate commerce, or their authority to establish post-roads, or their war powers, in pursuance of the constitutional provisions on the subject, or such regulation, as is authorized by the terms of the contract found in the acts of congress of 1862 and 1864, accepted by the railroad company as a contract. The Central Pacific Railroad Company is, simply, an artificial person, created with certain faculties by the state of California, and, it stands in relation to the United States, within the scope of its faculties, in precisely the same situation, as a natural person under like circumstances. The United States have no more, and no less, power over it, than they would have over a natural person in the same situation. The contract might as well have

been made with a natural person, as with a corporation. Had the grantee under the acts of congress been a natural person, instead of the Central Pacific Railroad Company, accepting the terms of the contract tendered by the act, and constructing the road, and performing the conditions of the contract, the rights of the United States would have been precisely such as they are, now, with respect to the Central Pacific Railroad Company,—no more, and no less. Since all the conditions of the contract on the part of the Central Pacific Railroad Company have been fully performed, in all respects, so far as they are required to be performed for that purpose, the title to the lands granted has fully vested, and the government bonds, having been delivered, the Central Pacific Railroad Company has become the absolute owner of the road, and all its appurtenances, together with the lands granted, and bonds issued, subject, only, to the mortgage to secure the payment of the bonds, issued by itself, and the lien of the government to secure its advances, in all respects in the same manner, and to the same extent, as if it were a natural person, similarly situated. The United States have no further control over, or interest in, said lands, or bonds. The United States, in sections 5 and 6 of the act of 1862, and section 5 of the act of 1864, tendered the railroad companies a contract, and, when accepted, there was a contract between the parties upon the terms specified, obligatory upon both, and which could not be changed by either, without the consent of the other. Says the supreme court, in *U. S.* v. *Railroad Co.*, 118 U. S. 238, 6 Sup. Ct. Rep. 1038, after quoting these provisions:

"These sections, taken together, constitute the contract between the United States and the appellee. *U. S.* v. *Railroad Co.*, 91 U. S. 72; *Sinking Fund Cases*, 99 U. S. 700–718; *Railroad Co.* v. *U. S.*, 104 U. S. 662. *This contract is binding on the United States*, and they *cannot*, without the consent *of the company, change its terms* by any subsequent legislation. *Sinking Fund Cases, supra.*"

Being the owner, with the title fully vested in it, the company could dispose of the lands and bonds, at its own will, and pleasure, in the same manner, and to the same extent, and with the same effect, as if the contract had been between two natural persons, without being liable to render any other account to the United States, than it could be called upon to render, had the United States been an association of an equal number of natural persons.

It is, consequently, a matter of no legal concern to the United States, what disposition the company made of the lands, or bonds, and they have no right to inquire into the matter of their disposition, in any other mode, or under any other circumstances, than they could have been inquired into had the corporation and the United States been two natural persons.

The relation of the Central Pacific Railroad Company to the United States, therefore, under the contract, as a contract, is now, simply, that of debtor, and creditor, with certain covenants for services on its completed road, still to be performed by the latter, with the debt, and performance of those covenants secured by certain specific liens upon portions of the prop-

erty of the debtor. They stand upon an equal footing as contractors, and upon the same footing, as debtor and creditor, as if the indebtedness, obligations, and securities existed between two natural persons. This is, clearly, the result, as established by the supreme court in the *Sinking Fund Cases*, which has, by a divided court, extended the power of congress further in that direction than any other case, and, as it seems to us, to the utmost admissible limit. In those cases the chief justice, who announced the opinion of the majority of the court, in speaking of the Union Pacific Company, which is a corporation created by congress itself, said:

> "The United States occupy towards this corporation a twofold relation,—that of sovereign, and that of creditor. *U. S.* v. *Railroad Co.*, 98 U. S. 569. Their rights as a sovereign are not crippled because they *are creditors, and their privileges as creditors are not enlarged by the charter because of their sovereignty. They cannot, as creditors, demand payment of what is due them before the time limited by the contract. Neither can they, as sovereign, or creditors, require the company to pay the other debts it owes, before they mature.*" 99 U. S. 724.

As to the Central Pacific Railroad Company, the United States do not even occupy the relation of sovereign, except so far as its road extends through the territories, and, then, only, as to that part of the road within a territory, which is now, only, that part in the territory of Utah; and so far as its authority to regulate commerce with foreign nations, and between the states, is concerned, and these powers are merely police powers. The organization of the Central Pacific Railroad Company is under, and by virtue of, the laws of another sovereignty, and its *habitat* is in the state of California, beyond the jurisdiction of the United States, except so far as it is subject to the power of congress under some special grant of power, or its control is necessary to carry out some power specially granted. We look, in vain, for any power to deal with it, except the power to regulate its acts, as an instrument of interstate, or foreign commerce, or such power as congress may have over it under its authority to establish post-roads, or under its war powers. The relation of debtor and creditor arising under a contract is but a private relation. It is not a sovereign, or governmental, relation. And the power reserved in the acts of congress to repeal, or amend the act as to the Central Pacific Railroad Company could, only, extend to amendment, so far as it operated *as a law*, and not as a contract, and, then, not to affect the terms of the contract after it had become executed, and rights had vested under it.

*If*, as said by the supreme court, the "privileges" of the United States, "*as creditors*, are not enlarged by the charter, because of their sovereignty," then no greater powers can be conferred upon the commission appointed by congress in this case, than congress could have conferred upon them for the investigation of matters between debtors and creditors, who are natural persons, citizens of, and residing *within states*. Could a private creditor authorize, or lawfully make, a compulsory examination of the character provided for in this act, into the private affairs of

his debtor? Or could congress, *within a state*, under its limited sovereign powers in a state, authorize a private creditor to make such an examination of his debtor's affairs, and call upon the courts, in like manner, to compel answers? Can the government do for itself, *as creditor within a state*, what it cannot do for private creditors? If not, and "*the privileges of the United States as creditors are not enlarged by the charter because of their sovereignty*," upon what principle can the compulsory examination attempted to be authorized by this act, be sustained? I can find none. This investigation, so far as the questions under consideration are concerned, is not for a sovereign, governmental purpose, but for the purpose of further securing a private debt, not yet matured, already secured by a contract, acceptable to, and accepted by, the creditor at the time it was made. And—

"The United States cannot any more than a state interfere with private rights, except for legitimate *governmental* purposes. They are not included within the constitutional prohibition which prevents states from passing laws, impairing the obligation of contracts, but equally with the states they are prohibited from depriving persons or corporations of property without due process of law. They cannot legislate back to themselves, without making compensation, the lands they have given this corporation to aid in the construction of its railroad. Neither can they, by legislation compel the corporation to discharge its obligations in respect to the subsidy bonds otherwise than according to the terms of the contract already made in that connection. The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a state, or a municipality or a citizen. *No change can be made in the title created by the grant of the lands, or in the contract for the subsidy bonds, without the consent of the corporation. All this is indisputable.*" The Chief Justice in the *Sinking Fund Cases*, 99 U. S. 718, 719.

Having ascertained the relation of the parties to each other to be, that of contractors,—that of debtor and creditor by contract, simply, in the same sense, as if both were natural persons, and private citizens,—the question arises, as to what authority congress has, *within a state*, through commissioners appointed by it, to investigate the private affairs of a mere contract debtor, and ascertain what he has done with his own money, or what he proposes to do with it,—whether he is making judicious investment of his money or not,—as bearing upon his probable ability to pay his debt, some years in the future, when it shall have matured?

Mr. Justice FIELD well said in the *Sinking Fund Cases*:

"When, therefore, the government of the United States entered into the contract with the Central Pacific Railroad Company, it could no more than a private corporation, or a private individual, finally construe and determine the extent of the company's rights and liabilities. If it had cause of complaint against the company, it could not undertake itself, by legislative decree, to redress the grievances; but was compelled to seek redress, as all other civil corporations are compelled, through the judicial tribunals. If the company was wasting its property, of which no allegation is made, or impairing the security of the government, the remedy by suit was ample. To declare that one of two contracting parties is entitled, under the contract be-

tween them, to the payment of a greater sum than is admitted to be payable, or to other or greater security than that given, is not a legislative function. It is judicial action; it is the exercise of judicial power, and all such power, with respect to any transaction arising under the laws of the United States, is vested by the constitution in the courts of the country." 99 U. S. 759, 760.

See, also, authorities cited.

I do not understand, that this doctrine is questioned by the majority of the court. They only differed as to its applicability in that particular case. I do not understand, that the Central Pacific Railroad Company is charged with a violation of any of the terms of its contract, unless it be claimed, that it has failed to pay over the full amount of percentage required by the contract of the net earnings of the road. If it has failed in this matter, it is not a matter of any legal concern to the government, what the company has done with its own. If it has failed in this particular, and there is reason for sustaining an action, the proper mode of procedure for ascertaining the truth, and enforcing the obligation, if violated, is to institute a suit, alleging the facts, and have an investigation in due course of judicial inquiry, and obtain a judgment for any amount improperly withheld. If the full amount has not been paid over, it matters not to the government, how the balance has been expended. The company is liable like any other debtor upon a contract, and not otherwise. But if it be desirable to trace it, and subject the specific fund to the uses contemplated, and there be sufficient ground for so doing, the courts are the proper tribunals in which to effect that object. So, also, if there be a commission of waste upon the property upon which the debt is secured, the courts afford the proper remedy by a suit in equity to restrain the waste. These are the means afforded by the constitution, and laws to private parties for redressing their wrongs. And there is no different remedy provided for the government on its contracts. In such proceedings, there would be allegations, which would inform the defendant what it is called upon to meet. In the language cited by Mr. Justice FIELD, from a case in the supreme court of Massachusetts, "like all other matters involving a controversy concerning public duty and private rights," it would in such proceedings "be adjusted and settled in the regular tribunals where questions of law and fact are adjudicated on fixed, established principles, and according to the forms and usages best adapted to secure the impartial administration of justice." *Sinking Fund Cases*, 99 U. S. 761 A bill in equity, that seeks a discovery upon general, loose, and vague allegations, is styled a "fishing bill," and such a bill would be, at once, dismissed on that ground. Story, Eq. Pl. § 325, and cases cited. A general, roving, offensive, inquisitorial, compulsory investigation, conducted by a commission without any allegations, upon no fixed principles, and governed by no rules of law, or of evidence, and no restrictions except its own will, or caprice, is unknown to our constitution and laws; and such an inquisition would be destructive of the rights of the citizen, and an intolerable tyranny. Let the power once be established, and there is no knowing, where the practice under it would end.

These principles, it appears to me, are established beyond further

controversy in the case of *Kilbourn* v. *Thompson*, 103 U. S. 168. At the time of the failure of the bankers, Jay Cooke & Co., they were largely indebted to the United States for moneys deposited by the secretary of the navy with a branch of the house in London. It was claimed, that Jay Cooke & Co. were largely interested in a company dealing in real estate at Washington, known as the "Real-Estate Pool," and that a considerable amount of their funds was invested in that speculation. It seems to have been claimed, also, that there was something in the nature of a trust in favor of the government in the moneys of Cooke & Co., that had gone into the pool. A committee was appointed to investigate the matter, and trace the money, with power to send for persons and papers. Kilbourn, supposed to be one of the managers of the pool, was summoned for examination. He refused to testify, on the ground that the house had no authority, in this manner, to inquire into the private affairs of the debtors of the government, and others connected with them. He was thereupon, upon proceedings for that purpose, committed by the house for contempt, and held in custody 45 days. After his release, he sued the sergeant-at-arms of the house, and the investigating committee, for false imprisonment, and recovered, on the first trial, a judgment of $60,000, and on a second trial $37,500, afterwards reduced to $20,000, on the ground that the house had no authority to make a compulsory investigation, or to commit him for contempt, for the reason, that these functions were judicial in their nature, over which the courts alone can have jurisdiction. When the case was before the supreme court it said in the course of its decision:

"If the United States *is a creditor of any citizen*, or of any one else, on whom process can be served, the usual, *the only legal mode of enforcing payment of the debt, is by a resort to a court of justice.* For this purpose, among others, congress has created courts of the United States, and officers have been appointed to prosecute the pleas of the government in these courts." 103 U. S. 193.

Again:

"What was this committee charged to do? To inquire into the nature and history of this real-estate pool. How indefinite. What was the real-estate pool? Is it charged with any crime or offense? *If so, the courts alone can punish the members of it.* Is it charged with fraud against the government? *Here, again, the courts, and they alone, can afford a remedy.* Was it a *corporation whose powers congress* could repeal? There is no suggestion of the kind." Id. 195.

Again:

"In looking to the preamble and resolutions under which the committee acted, before which Kilbourn refused to testify, we are of opinion that the house of representatives *not only exceeded the limit of its own authority, but assumed a power which could only be properly exercised by another branch of the government because it was in its nature clearly judicial.*" Id. 192.

And again, after stating some particulars to which the powers of the house to punish extends, the court added:

"Whether the power of punishment in either house, by fine or imprisonment, goes beyond this or not, *we are sure that no person can be punished for contumacy as a witness before either house unless his testimony is re-*

*quired in a matter into which the house has jurisdiction to inquire, and we feel equally sure that neither* of these bodies possesses the general power of making inquiry into the private affairs of the citizen." Id. 190.

After a thorough discussion of the case and an elaborate examination of the authorities, the court announced its unanimous conclusion in the following terms:

"We are of opinion, for these reasons, that the resolution of the house of representatives, authorizing the investigation, *was in excess of the power conferred on that body by the constitution; that the committee, therefore, had no lawful authority to require Kilbourn to testify as a witness beyond what he voluntarily chose to tell; that the orders and resolutions of the house and the warrant of the speaker, under which Kilbourn was imprisoned, are, in like manner, void, for want of jurisdiction in that body, and that his imprisonment is without any lawful authority.*" Id. 196.

In my judgment the principle established here covers fully the case under consideration. It establishes the position, that the house of representatives has no authority, or jurisdiction, to make a compulsory inquiry into the disposition of the funds of a conventional debtor of the United States; to inquire what this debtor, upon a contract, has done with his money, or to inquire into the private affairs of their debtors upon contract, and those dealing with such debtors.

It is urged that the decision only goes to the point, that private parties dealing with the debtor cannot be examined by the house; that the principle does not extend to the debtor himself, and, especially, to the Central Pacific Company, which is but a corporation, and that the present investigation only extends to what disposition it has made of the bonds, and proceeds of lands received from the government, and the money arising from operating its road. But there is no such limitation in the ruling. Says the court:

"Can the rights of the pool or of its members, *or the rights of the debtor, and of the creditor of the debtor*, be determined by the report of a committee, *or by an act of congress?* If they cannot, *what authority has the house to enter upon this investigation into the private affairs of individuals who hold no office under the government?*" Id. 195.

That the Central Pacific Railroad is a corporation in no way beholden to the United States for its corporate faculties, and franchises, and not a natural person, cannot affect the question. It is but an aggregation of natural persons, and is as much a private party, as if its constituents were united in a mere partnership, instead of a corporation. This principle was maintained in the *Railroad Tax Cases*, 9 Sawy. 166, and recognized by the supreme court at the argument of the same cases on appeal. The bonds issued, and the lands granted, as we have before seen, under the authorities cited, upon the completion of the road, and the specific earnings of the road, thereafter arising, were the absolute property of the Central Pacific Railroad Company, in which the United States had no legal concern, whatever, except so far as their lien by contract covers them. There is no element of a trust, public, or otherwise, in the case, as sometimes claimed, except in such sense, as any common carrier, whether by ox team, mule team, horse team, railway or steam-ship,

exercises a public trust, which is only subject to regulation under the police powers of the government, state, or national, as the case may require. That there is no element of trust in the case is ably shown by Mr. Justice HUNT, in *U. S.* v. *Railroad Co.*, 11 Blatchf. 403, and his ruling on this point was affirmed on appeal in 98 U. S. 570. But if there was a trust, as claimed, the administration of the laws relating to trusts is the peculiar province of courts of equity. It is no part of the functions of congress under the constitution.

It is further urged, that the judgment of imprisonment, only, was held to be beyond the jurisdiction of the house,—that the house, or congress, may investigate, and call upon the courts when so authorized, as in the present act, to perform the judicial part of the work, by enforcing the requirement of the commissioners. But there is no such limitation in the language of the court, as will be seen by re-examining the passages quoted. On the contrary, the want of power in the house to punish is grounded on the want of power to investigate at all. It is directly said, in the case cited, that the house may punish for contempt, in certain specified cases, wherein the power is conferred by the constitution, or when necessary to the proper execution of powers expressly conferred. And the court with reference to those instances, as we have seen, says, in terms:

> "Whether the power of punishment in either house by fine and imprisonment goes beyond this or not, we are sure that no person can be punished for contumacy as a witness before either house *unless his testimony is required in a matter into which that house has jurisdiction to inquire, and we feel equally sure that neither of those bodies possesses the general power of making inquiry into the private affairs of the citizen.*" *Kilbourn* v. *Thompson*, 103 U. S. 190.

That was a case, like this, wherein the house was seeking to inquire into the private affairs of the debtor,—seeking to ascertain what that debtor had done with his money, some of which he held as a depositary of the United States. The decision was not put upon the ground, that the house could not in any case punish for contempt, but, on the ground, that the house in cases like this, had no authority to make the inquiry at all, and, consequently, there could be no punishment for contempt, either by the house, or any other body or tribunal.

Under the act now in question, congress has undertaken to authorize a commission to make inquiry into the private affairs of its creditor,—into the purpose, for which the debtor appropriated its own funds,—which the supreme court, in the case cited, says it has no power to do, and the commission is authorized to call upon the courts to aid it in its unlawful inquiry. The court is not called upon to act in any judicial proceeding, or investigation pending before it, or before any other court, in the discharge of its judicial functions, or any matter ancillary to the exercise of its judicial functions. There is no case or controversy, at all, pending before it of which the proceeding attempted to be authorized is a part, or to which it is ancillary or in any way pertinent. It does not appear to us, that it is contemplated by the act, that the court, in the investigation provided for, when called upon to aid the commission,

shall inquire beyond the point whether the question asked is within the scope of the broad field of inquiry prescribed. And so the commissioners claim, for they have conducted their investigation on that theory; and they insist, that they are not bound by any rules of evidence, or, other principles of law observed by courts of justice, and by which the latter are guided, and controlled, in the ascertainment of facts in the course of ordinary judicial proceedings. If this be the correct view, the court is expected to compel an answer irrespective of any other considerations. Even questions criminating the witness, are to be answered, the only protection to the party being that his answer shall not be used against him in a criminal prosecution,—a protection of little avail to any party, who should disclose criminal acts upon which an indictment could be found, and should upon compulsion indicate other sources of evidence, by means of which, the acts disclosed can be proved; and such acts may also constitute offenses under the laws of the state, against which congress can afford no immunity.

As bearing upon the power of congress to compel an answer to criminating questions, or compel the production of private papers, see *Boyd* v. *U. S.*, 116 U. S. 616, 6 Sup. Ct. Rep. 524. The principles therein established are equally applicable to the matter now under consideration. The court seems, therefore, to be called upon to compel, under process for contempt, an answer to any question which the commission sees fit to ask within the scope of the inquiry attempted to be authorized by the act. If this be so, the court is, simply, made an instrument by this act, in the hands of the commission, to execute its unregulated and unrestricted will. The court is made the ministerial agent of the commission to perform its behests, whenever a witness refuses to respond to a question, or produce papers within the range of the authority attempted to be given by the statute. The judicial department of the government is, simply, made, by this act, an adjunct to the legislative department in the exercise of its political and legislative functions, and powers, to execute its commands,—and that, too, in a matter into which congress, under the decision cited, has no jurisdiction whatever to inquire. I know of no power in congress, to thus render the judicial department subordinate, or ancillary to the legislative and executive departments of the government, or to either of them. If there is any one proposition immutably established, I had supposed it to be, that the judiciary department is absolutely independent of the other departments of the government,—that it cannot be called upon to act a part subordinate to any other department of the government, or to a commission armed with exasperating inquisitorial powers over private affairs, unlimited by any consideration other than its own unregulated discretion. And so I understand the authorities to be. "The functions of the judges of the courts of the United States are strictly and exclusively judicial. They cannot, therefore, be called upon to advise the president in any interpretation of law, or to act as commissioners in cases of pensions or other like proceedings." 2 Story, Const. § 1777, and cases cited.

The courts, in this instance, are called upon not to exercise their ordinary powers in the administration of justice, but to assist congress in the exercise of its deliberative, legislative, and political powers,—to aid it by irregular, and extraordinary, not to say unprecedented means,—to act as its agent in matters wholly foreign to the functions of the judiciary. In my judgment, therefore, reason and the authorities cited establish, beyond reasonable ground for controversy, the proposition, that there is no lawful authority in the commissioners to compel answers to the various questions propounded and set out in the petition, or any of them, which the respondent refused to answer, nor can the courts be lawfully required to compel answers thereto.

I concur in the order made, discharging the order to show cause.

SABIN, J., (*concurring.*) In announcing my concurrence in the opinions of the circuit justice and the circuit judge in this matter, I do not deem it necessary to review at any length the questions by them so ably and satisfactorily discussed and decided. In this application to the court to issue its subpœna, and compel answers to be made to the various questions propounded, the court is called upon to exercise no judicial function or power, unless it be the very slight duty of determining whether or not the questions propounded are within the scope of the inquiry authorized by the act of congress creating the commission. The act itself is most broad and comprehensive in its terms, and imposes little, if any, restraint upon the commission in the field of its inquiry. It scarcely needs the ruling of a court to determine whether the questions propounded, or any questions which may be propounded, by this commission, are within the scope and purview of the act creating the commission. But, aside from this most simple and limited duty, if duty it may be, the court has no judicial function to perform in this matter. It is simply called upon by the commission to execute its will; to compel the attendance and obedience of witnesses,—a purely ministerial duty,—to serve as a convenient adjunct to the commission. I cannot think that the courts were organized for any such purpose, or that they can be called upon to perform any such duty.

I need not advert to the nature and character of many of the questions propounded by the commission, as appears from the record of this proceeding, answers to which the court is asked to compel. They seem to be quite in keeping with some of the extraordinary powers claimed and exercised by the commission, and to fully confirm their assumed right to disregard the usual and established rules of evidence and principles of law in conducting their investigations. And this court is seriously asked to lend its aid in furtherance of such purpose. Many of the questions propounded would seem, from the record, to have been answered as fully as it was possible for the witness to answer them. I do not, however, press this consideration, as I think this decision should rest, not upon the simple fact as to whether or not the questions have been fully answered, but upon the broader and more important principles which underlie this whole subject, to-wit: Has this commission

lawful right to hold this investigation; to propound these questions, and compel answers thereto; to inquire into the private affairs of this respondent, or of the Central Pacific Railroad Company, or of any individual, and invoke the powers of this court to carry out such purpose? These questions are so fully and ably discussed in the opinions rendered that further comment thereon seems unnecessary.

It is not claimed that this is a "case" or a "controversy" between any parties to which the judicial power extends, and over which it has proper jurisdiction. Neither the United States nor any other person is making complaint against this respondent, or against said railroad company, in any form or manner known to judicial proceedings. No charges are made against the one or the other, by any one, of duties neglected or obligations unfulfilled. In regard to the very account immediately under consideration by the commission, and in reference to which many of the questions were propounded, to which we are asked to compel answers, it is shown that this account was fully settled and adjusted by and between the United States and said company long ago. Upon page 21 of the argument of the United States attorney, submitted in support of this motion, it is stated:

"Some question was made as to whether, as a matter of fact, the moneys covered by Mr. Stanford's vouchers had been included in the account rendered to the government for the purpose of ascertaining the net earnings of the company. The commissioners do not desire a decision based upon this question, and therefore concede, for the purpose of this motion, that the amounts in question have not been charged as against the United States, to the end that this matter may be disposed of entirely on its merits."

If this be true, what interest, then, is it to the United States, even if it had a right so to do, to inquire how, or in what manner, this account accrued or was paid? It concerns the United States in no manner,—affects no pecuniary right or interest claimed by it, due or not matured. What interest, then, has the United States in this inquiry beyond that of any third party whose curiosity might prompt him to inquire into that concerning which he has no right or interest? Is not this, then, a mere idle inquiry, not made in the interest of, or to preserve or establish the rights of, the government or any person? Has not any third person, to gratify an idle curiosity, the same right to institute these inquiries, and invoke the aid of the courts in support thereof? Courts do not entertain such investigations or inquiries, or lend their aid thereto. If this power of unlimited, inquisitorial investigation into the affairs of private corporations or companies, or of individuals,—and it concerns all alike,—shall be once established, who can say where it will end, or what will be its limit of injustice at all times, but more especially when called into exercise in times of political excitement, or under the influence of partisan zeal or passion? In the close adherence to well-settled principles of law, founded upon the just observance of the rights of all parties, will we not find the greatest safety alike to public and private rights?

Without further discussion of the subject, I fully concur in the opinions read, and in the order made.