**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Howard D. REAGAN, Defendant-Appellant.**

**No. 71-1262.**

United States Court of Appeals, Sixth Circuit.

Dec. 9, 1971.

James J. Carroll (Court appointed), Cleveland, Ohio and William E. Fuller, New York City, for defendant-appellant.

Robert W. Jones, Asst. U. S. Atty., Cleveland, Ohio (Frederick M. Coleman, U. S. Atty., Edward F. Marek, Asst. U. S. Atty., Cleveland, Ohio, on the brief), for plaintiff-appellee.

Before EDWARDS, McCREE, and MILLER, Circuit Judges.

WILLIAM E. MILLER, Circuit Judge.

This is an appeal from a conviction for voluntary manslaughter. 18 U.S.C. Sec. 1111 provides that murder in the first degree is the unlawful killing of a human being with malice aforethought or if committed in perpetration of any robbery or burglary within "the special maritime * * * jurisdiction of the United States."

18 U.S.C. Sec. 7 specifically defines the special maritime jurisdiction of the United States as follows:

The term "special maritime and territorial jurisdiction of the United States," as used in this title, includes:

(1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State.

The appellant was charged with three counts under 18 U.S.C. Sec. 1111: first, with intentional and premeditated murder of Joseph Speidell, a fellow seaman; second, with murder in perpetration of a robbery; and third, with murder in perpetration of burglary. After a five week trial beginning in October 1970, the district court dismissed the third count of the indictment and submitted the case to the jury on the first two counts, also charging the jury that it could consider whether the appellant was guilty of the lesser included offense of voluntary manslaughter made a federal offense by 18 U.S.C. Sec. 1112 if committed within the special maritime jurisdiction of the United States. The jury found the appellant guilty of the lesser included offense of voluntary manslaughter and not guilty of all other charges. Following denial of his motion for a new trial appellant perfected his appeal to this Court.

The events out of which the charges against appellant arose occurred on an American vessel, the SS *Thunderbird*, in the harbor of Bremerhaven, Germany, close to the noon hour on December 16, 1966. The harbor is located on the east bank of the Weser River which flows north past Bremen and Bremerhaven into the North Sea. Bremerhaven is approximately sixty kilometers inland from the boundary which separates German inland waters and the international waters of the North Sea. As a result of extreme tides, the harbor is separated from the Weser River by locks. These are opened to permit vessels to enter and

depart the harbor only at certain stages of the tide.

Much evidence was offered in this prolonged trial and many versions of the events leading up to and immediately following the slaying were presented to the jury. No effort need be made here to recount or even to summarize the entire testimony.

The nature of the relationship between the appellant and the victim is by no means clear either generally or on the morning of the slaying. There is evidence that Reagan and another were in Speidell's (the victim's) room prior to the assault for a drink of whiskey. It is suggested that Speidell made a homosexual advance toward Reagan at this time. In addition there is testimony that the two had a "mild argument" outside Speidell's cabin. There is also testimony, however, that soon thereafter, Reagan loudly proclaimed the injustice of Speidell's being unable to go ashore because of work. Reagan had been drinking in the morning and the appellant asserts that this drinking was sufficiently substantial to cause him to be unable to remember what transpired at approximately the time of the slaying.

In any event, the evidence shows that at aproximately noon, Speidell appeared on the bridge with his throat cut and bleeding. At this point, he could speak, but he did not identify his assailant. The details of the assault were not ascertained.

At about the same time, in a bloody and frenzied state, the appellant was seen entering and leaving the cabin next to Speidell's. After he left the cabin his new hunting knife was found there and turned over to the Master. Subsequent examination of the knife disclosed that it bore no traces of blood or tissue. Reagan next appeared in the ship's galley, still in a frenzied state, where he was confronted by Sidney Howard who attempted to restrain him. In doing this Howard struck Reagan with some type of object. Reagan broke free from Howard and fled staggering aft along the port side passageway and across the ship to the starboard passage where he met the Chief Mate. He fell at the feet of the mate and uttered the plea: "Chief Mate, Chief Mate, help me, help me." The Captain appeared armed with a pistol and directed the Chief Mate to handcuff Reagan and directed that he be watched. The appellant broke away once more. He was again restrained and this time taken ashore and tied to a box-car.

During this period Reagan made many wild and irrational statements, some in response to questions relating to the knifing of Speidell and others not. A number of these statements suggested strongly that Reagan had indeed wielded the knife against Speidell. The following examination of chief enginer John Jedilinic is representative:

Q. What did you do?

A. I stopped him.

Q. What do you mean you stopped him?

A. I stopped him. I said, "You can't go up there."

Q. All right. Did you say something else?

A. Yes sir. I told him, I said, "You did enough damage and Speidell died."

Q. Did he reply to that?

A. Yes sir, he did.

Q. What did he say?

A. He said, "I did it. I hope he dies. I want to finish him."

Q. And those were Mr. Reagan's words?

A. Yes, that was Mr. Reagan's words.

There was also testimony that Reagan said to the Captain, "They tried to kill me."

The German authorities were called and Reagan was taken into custody. On December 17, 1966, the day after the slaying, he was judicially committed to a State mental institution in Bremen. The *SS Thunderbird* departed Bremerhaven about 1:00 p. m. on this date. Reagan remained in the German institution till after the ship returned to Brem-

erhaven about April 1, 1967. On April 5, 1967 a Judge of the appropriate German County Court refused to issue a Warrant of Arrest for the crime of murder sought by the German Prosecutor, finding no probable cause for an arrest.

After his release in Bremen, Reagan returned to the Kennedy Airport where, though no charges were pending against him, he was met by agents of the Coast Guard and F.B.I. and told to return to his home in Cleveland and not to sail on foreign voyages. Thereafter, the U.S. Coast Guard in Bremen, acting for the F.B.I., requested the appropriate German authorities to release to them the records pertaining to the Reagan matter. This request was denied on the ground that under German law such records may not be released without the consent of the accused, a consent which Reagan refused to give. On November 3, 1967 Judge James C. Connell of the United States District Court for the Northern District of Ohio, Eastern Division, requested from the "appropriate judicial authorities in Land Bremen, Federal Republic of Germany" the records sought by the F.B.I. and the Coast Guard. The request in the form but not in the words of a "letter rogatory" is set forth below.[1] Pursuant to this request, the German file was sent to the district court and made available to the office of the U. S. Attorney in early 1968.

On September 12, 1969 a grand jury indictment was returned. On September 15, 1969 it was opened, docketed and a warrant for the appellant's arrest was issued. He was then taken into custody. The trial and appellant's conviction followed. From this conviction appellant perfected his appeal.

Appellant makes numerous contentions. He asserts: the district court was without subject matter jurisdiction; the indictment was deficient in that it failed to allege an essential element of jurisdiction; the delay in prosecuting him constituted a denial of his due process rights under Dickey v. Florida, 398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970); the request for international judicial assistance was without the jurisdiction of the

---

1. IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO EASTERN DIVISION
REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE
To the appropriate judicial authorities in the Land Bremen, Federal Republic of Germany:
There is currently pending within the jurisdiction of this Court an investigation into an alleged homicide committed on December 16, 1966, by Howard Reagan, an American National, on Joseph J. Speidell, at Bremerhaven, Germany. It is this Court's understanding that the Prosecutor in Bremerhaven, Federal Republic of Germany conducted an investigation of the alleged offense beginning in the month of December, 1966.
The United States authorities in this district are currently conducting an investigation of the same incident. It would be most helpful, and in the furtherance of justice, if the investigative files of the German authorities in Bremerhaven, including, but not limited to, oral or written statements of all witnesses, reports of investigative officers, reports of any autopsy or post-mortem medical examination of the deceased, medical or psychiatric reports from any examination of the suspect (Reagan), any photographs, and any oral or written statements of the suspect (Reagan), could be made available to the United States investigative authorities. To that end, a request is hereby made that the pertinent files and exhibits, currently in the possession or in the custody of the German authorities in Bremerhaven, be made available to this Court.
The Courts of the United States are authorized by statute, 28 U.S.C. 1781, et seq., to extend similar assistance to the tribunals of the Federal Republic of Germany. Such assistance has been, and is being, rendered; thus, reciprocity is assured.
The Court assures the judicial authorities in the Land Bremen that any records or exhibits which may be made available, pursuant to this request, will be promptly returned, after they have served their purpose.
The Court takes this opportunity to extend to the Judicial authorities of the Land Bremen the assurance of its highest consideration.
Nov. 3, 1967
s/ James C. Connell
JUDGE, UNITED STATES
DISTRICT COURT

district court at the time issued and constituted an abuse of discretion; the failure of the district court to suppress evidence which was the fruit of the request was reversible error; the admission of the testimony of a German police official who was brought to this country by the government was reversible error in light of the court's failure to provide for the bringing of defense witnesses to this country from Germany; he was placed in double jeopardy because of the German proceeding; the failure to declare a mistrial upon his emotional outburst at trial constituted a reversible error; and finally appellant says that the evidence was insufficient to support a conviction for voluntary manslaughter. We have carefully considered each of these contentions on the basis of the record and pertinent authorities. We find it necessary to discuss only the issues concerning jurisdiction and the issuance of a letter rogatory.

## JURISDICTION

The appellant contends at the outset that the district court was without subject matter jurisdiction. He asserts:

> The District Court below consistently erred as a matter of law in applying the "concurrent jurisdiction" theory of the law of the flag and the law of the local sovereign as an absolute.

Both parties appear to agree that the legal principles relevant to this issue were set forth by the Supreme Court in Mali v. Keeper of the Common Jail (Wildenhus' Case) 120 U.S. 1, 7 S.Ct. 385, 30 L.Ed. 565 (1887) and United States v. Flores, 289 U.S. 137, 53 S.Ct. 580, 77 L.Ed. 1086 (1933). They differ, however, as to the precise nature of the doctrine and its application to the instant circumstances. It is well to review briefly these cases.

The first, Mali v. Keeper of the Common Jail, *supra*, involved the trial of a Belgian seaman, Wildenhus, who was in the custody of New Jersey authorities on a charge of homicide arising out of the death of another Belgian seaman. The death followed an altercation be-

tween Wildenhus and the deceased and occurred on board a Belgian vessel lying in New Jersey waters. Holding that New Jersey had the power to prosecute Wildenhus, the Court stated:

> It is part of the law of civilized nations that, when a merchant vessel of one country enters the ports of another for the purposes of trade, it subjects itself to the law of the place to which it goes, unless, by treaty or otherwise the two countries have come to some different understanding or agreement; * * *
>
> From experience, however, it was found long ago that it would be beneficial to commerce if the local government would abstain from interfering with the internal discipline of the ship, and the general regulation of the rights and duties of the officers and crew towards the vessel or among themselves. And so by comity it came to be generally understood among civilized nations that all matters of discipline and all things done on board which affected only the vessel, or those belonging to her, and did not involve the peace or dignity of the country, or the tranquillity of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation or the interests of its commerce should require. But if crimes are committed on board of a character to disturb the peace and tranquillity of the country to which the vessel has been brought, the offenders have never by comity or usage been entitled to any exemption from the operation of the local laws for their punishment, if the local tribunals see fit to assert their authority. 120 U.S. at 11, 12, 7 S.Ct. at 387.

Felonious homicide, the Court held, was a crime disturbing to "the peace and tranquillity" of the local sovereign. It was stated:

> Much will undoubtedly depend on the attending circumstances of the particular case, but all must concede that

felonious homicide is a subject for the local jurisdiction; and that, if the proper authorities are proceeding with the case in a regular way, the consul has no right to interfere to prevent it. 120 U.S. at 18, 7 S.Ct. at 390.

In United States v. Flores, 289 U.S. 137, 53 S.Ct. 580, 77 L.Ed. 1086 (1933), the Supreme Court considered the converse—a case in which the local authorities did not "see fit to assert their authority." There the defendant, a citizen of the United States, was charged with the murder of another citizen of the United States upon the *S.S. Padnsay*, an American vessel. The ship was anchored at this time in the Port of Matadi, in the Belgian Congo, *some two hundred-fifty miles up the Congo River*. The court below had sustained a demurrer to the indictment for want of proper jurisdiction. Reversing, the Supreme Court made it abundantly clear that, absent assertion of jurisdiction on the part of the local sovereign, the flag sovereign has jurisdiction in such a case. In so holding, the Court discussed the ruling in the *Wildenhus Case, supra,* and demonstrated that the ruling there did not in any way conflict with the holding in the case before it. We take the liberty of quoting at length from *Flores, supra:*

There is not entire agreement among nations or the writers on international law as to which sovereignty should yield to the other when the jurisdiction is asserted by both. See Jessup, the Law of Territorial Waters, 144–193. The position of the United States, exemplified in *Wildenhus's Case*, 120 U.S. 1, 7 S.Ct. 385, 30 L.Ed. 565, has been that at least in the case of major crimes, affecting the peace and tranquillity of the port, the jurisdiction asserted by the sovereign-

ty of the port must prevail over that of the vessel.

\* \* \* \* \* \*

It [the Court in *Wildenhus'* case] said, page 12, 7 S.Ct. page 387:

"And so by comity it came to be generally understood among civilized nations that all matters of discipline and all things done on board which affected only the vessel, or those belonging to her, and did not involve the peace or dignity of the country, or the tranquillity of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation or the interests of its commerce should require. But if crimes are committed on board of a character to disturb the peace and tranquillity of the country to which the vessel has been brought, the offenders have never by comity or usage been entitled to any exemption from the operation of the local laws for their punishment, if the local tribunals see fit to assert their authority."

█ This doctrine does not impinge on that laid down in United States v. Rodgers [150 U.S. 264, 14 S.Ct. 109, 37 L.Ed. 1071], *supra,* that the United States may define and punish offenses committed by its own citizens on its own vessels while within foreign waters where the local sovereign has not asserted its jurisdiction. In the absence of any controlling treaty provision, and any assertion of jurisdiction by the territorial sovereign, it is the duty of the courts of the United States to apply to offenses committed by its citizens on vessels flying its flag, its own statutes, interpreted in the light of recognized principles of international law. 289 U.S. at 157, 158 and 159, 53 S.Ct. at 586.[2]

---

2. At 289 U.S. 157, 53 S.Ct. 585, Mr. Justice Stone stated:

This qualification of the territorial principle in the case of vessels of the flag was urged by Mr. Webster while Secretary of State, in his letter to Lord Ashburton of August 1, 1842, quoted with approval in United States v.

Rodgers, *supra,* 150 U.S. 264, 265, 14 S.Ct. 109.

We think it appropriate to quote Webster as did Mr. Justice Stone:

It is natural to consider the vessels of a nation as parts of its territory, though at sea, as the State retains its jurisdiction over them; and, according

Since there is no "controlling treaty provision" the resolution of the question before us turns upon whether there has been "any assertion of jurisdiction by the territorial sovereign." It is our view that there was no "assertion of jurisdiction" by Germany and, therefore, that the district court was not without jurisdiction.

The record shows that Reagan was taken into custody by German authorities on December 16, 1966, and judicially committed to a German mental institution on December 17, 1966, when his ship went to sea. He was subsequently released (after the return of the *SS Thunderbird* to port) and on April 5, 1967 the appropriate local court refused to issue a warrant for Reagan's arrest requested by the local prosecutor, finding that there was no probable cause for the issuance of such a warrant. The German court had before it the results of a rather extensive police investigation.

█ We do not believe that this preliminary proceeding constituted an "assertion of jurisdiction" by the local sovereign which would operate to oust the jurisdiction of the flag sovereign. It would appear that for whatever its reasons, the German court declined to "assert jurisdiction" within the meaning of *Flores, supra.* The application of the doctrine of "concurrent jurisdiction" is based on principles of comity. Assertion by the court below of its own jurisdiction in no way infringed upon the jurisdiction of the German court. The appropriate German authorities carefully scrutinized the matter and no formal charges were ever brought. There was no determination of Reagan's guilt or innocence. A different case would be presented if Reagan had been brought to trial in Germany or perhaps even if he had been indicted in Germany. We hold that the district court did have proper subject matter jurisdiction.

## LETTERS ROGATORY

The appellant argues that the district court exceeded its jurisdiction in requesting international judicial assistance through the medium of a "letter rogatory" since there was no "case or controversy" before it, and that it therefore erred in not suppressing the fruits of this request. We must disagree al-

---

to the commonly received custom, this jurisdiction is preserved over the vessels even in parts of the sea subject to a foreign dominion. This is the doctrine of the law of nations, clearly laid down by writers of received authority, and entirely conformable, as it is supposed, with the practice of modern nations. If a murder be committed on board of an American vessel by one of the crew upon another or upon a passenger, or by a passenger on one of the crew or another passenger, while such vessel is lying in a port within the jurisdiction of a foreign State or sovereignty, the offense is cognizable and punishable by the proper court of the United States in the same manner as if such offense had been committed on board the vessel on the high seas. The law of England is supposed to be the same. It is true that the jurisdiction of a nation over a vessel belonging to it, while lying in the port of another, is not necessarily wholly exclusive. We do not so consider or so assert it. For any un-

lawful acts done by her while thus lying in port, and for all contracts entered into while there, by her master or owners, she and they must, doubtless, be answerable to the laws of the place. Nor, if her master or crew, while on board in such port, break the peace of the community by the commission of crimes, can exemption be claimed for them. But, nevertheless, the law of nations, as I have stated it, and the statutes of governments founded on that law, as I have referred to them, show that enlightened nations, in modern times, do clearly hold that the jurisdiction and laws of a nation accompany her ships not only over the high seas, but into ports and harbors, or wheresoever else they may be water-borne, for the general purpose of governing and regulating the rights, duties, and obligations of those on board thereof, and that, to the extent of the exercise of this jurisdiction, they are considered as parts of the territory of the nation herself. 6 Webster's Works, 306, 307.

though concededly the contention is not without some support.[3]

28 U.S.C. § 1781 recognizes, impliedly at least, the power of federal courts to transmit letters rogatory to foreign tribunals.

(a) The Department of State has power, directly, or through suitable channels—

(1) to receive a letter rogatory issued, or request made, by a foreign or international tribunal, to transmit it to the tribunal, officer, or agency in the United States to whom it is addressed, and to receive and return it after execution; and

(2) to receive a letter rogatory issued, or request made, by a tribunal in the United States, to transmit it to the foreign or international tribunal officer, or agency to whom it is addressed, and to receive and return it after execution.

(b) This section does not preclude—

(1) the transmittal of a letter rogatory or request directly from a foreign or international tribunal to the tribunal, officer, or agency in the United States to whom it is addressed and its return in the same manner; or

(2) the transmittal of a letter rogatory or request directly from a tribunal in the United States to the foreign or international tribunal, officer, or agency to whom it is addressed and its return in the same manner.

In United States v. Staples, 256 F.2d 290 (1958), the Ninth Circuit pointed correctly to the source of a court's power to issue letters rogatory:

This Court, like all courts of the United States, has *inherent* power to issue Letters Rogatory. The manner of taking proof is left to our discretion. 256 F.2d at 292. (Emphasis added.)

We find no definitive authority, however, as to precisely when this power attaches in a given case.

The opinion of the Court of Appeals in In re Pacific Ry. Comm'n, 32 F. 241 (Cir. Ct. N.D.Cal., 1887), is suggestive though not squarely in point. There the Court held that the Pacific Railway Commission created by Act of Congress did not have the power to issue letters rogatory. Speaking of this instrument, the Court stated:

There are certain powers inherent in all courts. The power to preserve order in their proceedings, and to punish for contempt of their authority, are instances of this kind. And by jurists and text writers the power of the courts of record of one country, as a matter of comity, to furnish assistance, so far as is consistent with their own jurisdiction, to the courts of another country, by taking the testimony of witnesses to be used in the foreign country, or by ordering it to be taken before a magistrate or commissioner, has also been classed among their inherent powers. "For by the law of nations," says Greenleaf, "courts of justice of different countries are bound mutually to aid and assist each other, for the furtherance of justice; and hence, when the testimony of a foreign witness is necessary, the court before which the action is pending may send to the court within whose jurisdiction the witness resides a writ, either patent or close, usually termed a letter rogatory, or a commission *sub mutuae vicissitudinis obtentu ac in juris subsidium,* from those words contained in it. By this instrument the court abroad is informed of the pendency of the cause, and the names of the foreign witnesses, and is requested to cause their depositions to be taken in due course of law, for the furtherance of justice, *with an offer on the part of the tribunal making the request to do the like for the other in a similar case."* Treatise on Evidence, vol. 1, § 320. The comity in behalf of which this power is exercised cannot, of course, be invoked by any mere inves-

---

3. See e. g., 3 Benedict on Admiralty, § 400, p. 93.

tigating commission, 32 F. at 256, 257. (Emphasis added.)

And in the preceding paragraphs the Court quoted Chief Justice Marshall in Osborn v. United States Bank, 9 Wheat. 738, 819, 6 L.Ed. 204:

> This clause enables the judicial department to receive jurisdiction to the full extent of the constitution, laws, and treaties of the United States, when any question respecting them shall assume such a form that the judicial power is capable of acting on it. That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law. It then becomes a case, and the constitution declares that the judicial power shall extend to all cases arising under the constitution, laws, and treaties of the United States. 32 F. at 256.

In a footnote the Court stated:

> The judicial power of the courts of the United States extending to the cases and controversies enumerated in the constitution, their jurisdiction necessarily covers all proceedings taken from the formal commencement of such cases and controversies to the execution of the judgments rendered therein. *A certain class of offenders can only be prosecuted in the federal courts through the indictment or presentment of a grand jury.* Article 5 of Amendments. *Over, therefore, the proceedings of such bodies those courts can exercise jurisdiction, and in aid of their deliberations can issue process, and compel the attendance of witnesses, and require them to answer any* proper questions propounded to them, and in case of refusal may punish them as for a contempt.

> Proceedings to perpetuate testimony, where litigation is expected or apprehended, are within the ordinary jurisdiction of courts of equity, and come under the designation of "cases in equity" in the constitution. 32 F. at 257 n. 1. (Emphasis added.)

Similarly, it would seem that preliminary steps taken by a federal court to obtain evidence from a foreign power, in aid of its jurisdiction in criminal cases, would be within its Article III power over cases and controversies.

██ Absent substantial and controlling authority, we are unwilling to hold here that a court may only issue a letter rogatory after an indictment is returned in a criminal case. We are not persuaded that the issuance of such an ex parte instrument is incompatible with the fair operation of our system of justice.[4]

It should be pointed out that the German record was used not as the principal part of the prosecution's case, but for purposes which appear to have been limited in nature. For example, it may be assumed that by use of the record the government obtained the name of the police official Volkmann (although it may have obtained this name from other sources). His testimony, however, was given at the trial below and no statement or testimony on his part was read from the record which had been procured pursuant to the letter rogatory. Further, as possible fruits of the request, appellant points to certain fingerprints and photographs of the victim's room which were

---

4. The invocation of judicial power prior to formal charges being made or before filing suit is indeed a common practice in our jurisprudence, examples being orders for the taking of testimony de bene esse; and the issuance of search warrants to aid possible criminal prosecutions. Other examples are plentiful. The supervisory power of courts over grand jury proceedings, as pointed out by the court in In re Pacific Ry. Comm'n, *supra*, is illustrative of the same concept. In the present case while the instrument issued by the district judge to obtain the foreign record is not formally characterized as a "letter rogatory," we think that such was its real meaning and intent. That its function was to obtain documents instead of the testimony of witnesses is of no significance in our view. If it be assumed that German law required the appellant's consent before the record could be released, appellant would have no right to complain because Germany saw fit, in the interest of comity, to waive the requirement of its own law.

used at the trial. While it must, therefore, be assumed that the foreign record was of some value to the government, an examination of the entire record of the trial below indicates to us that if error was committed on the part of the court in requesting the foreign record and allowing its limited use at trial, such error must be regarded as "harmless." Ample testimony was presented to the jury, apart from the foreign record, concerning Reagan's appearance and actions immediately following the stabbing and his own incriminating statements made in the presence of shipmates. Such evidence appears to us to have been decisive in linking the appellant with the murder on shipboard.

Appellant's further contentions enumerated above have been carefully considered and we find them to be without merit.

The judgment of the district court is therefore

Affirmed.