**UNITED STATES of America**

v.

**Russell STRONG.**

**Crim. A. No. 85–3.**

United States District Court,
E.D. Pennsylvania.

March 5, 1985.

Linda Dale Hoffa, Asst. U.S. Atty., Philadelphia, Pa., for the U.S.

Walter Philips, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION, AND CONCLUSIONS OF LAW

HUYETT, District Judge.

Presently pending before me are the government's applications to request the assistance of the judiciaries of Hong Kong and Singapore and for the exclusion of time under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* These motions present several novel issues of law. In order to set them in the proper framework, I will very briefly describe the nature of the charges against the defendant.

Defendant Strong is charged with five counts of violating 18 U.S.C. § 287 (filing false claims). It is alleged that Strong filed false amended tax returns in the names of several Americans who resided in Indonesia. Each of these amended returns would have resulted in large refunds to the taxpayers. It is alleged that Strong directed that the refund checks be sent to two addresses in Hong Kong. One of these was a post office box registered to the name of Puta Caliente Ltd., a Hong Kong Corporation. The other address was the location of Golden Trinity Ltd., another Hong Kong corporation. It is further alleged that Strong was personally involved in both of these businesses.

The Internal Revenue Service ("IRS") at one point sent a refund check to the Hong

Kong address and it is alleged that the proceeds from that check found their way from Hong Kong to a bank account in California, and from there at least some part of the funds were transferred to the defendant's account in Beckenridge, Texas.

On February 22, 1985, I held oral argument on the government's motions. I have decided to grant the government's applications and to exclude the time necessary under the Speedy Trial Act. In support of that decision, I make the following findings of fact.[1]

## FINDINGS OF FACT

1. On January 3, 1985 a federal grand jury in the Eastern District of Pennsylvania returned a five-count indictment charging the defendant Russell Strong with violations of 18 U.S.C. § 287 (filing false claims against the United States).

2. On January 17, 1985, the defendant was arraigned and entered a plea of not guilty on all counts before United States Magistrate Peter B. Scuderi.

3. On January 28, 1985, the government filed separate applications to this court to request the assistance of the judiciary of Hong Kong and the judiciary of Singapore in the preparation of this case for trial.

4. Simultaneous with the filing of the requests for judicial assistance, the government filed a motion, pursuant to 18 U.S.C. §§ 3161(h)(3)(A), 3161(h)(8), and 3161(h)(1)(F), requesting that excludable time in this matter be computed and entered on the record from the date of the filing of the requests for judicial assistance until such time as the requests are either granted or denied by the respective foreign judiciaries or other prompt disposition is made.

5. During the investigation of this case, in January and February, 1983, the government learned through an interview with Max Brown, an American citizen residing in Hong Kong, that Shirley Chan, a citizen of Hong Kong, had important information.

Specifically, Brown advised the IRS investigator of the following:

a. Shirley Chan, a director of Golden Trinity Limited, had received a series of written instructions from Russell Strong using the alias of Pedro. In one letter, Chan was directed to open Post Office Box 20343 for Strong's company, Puta Caliente. This post office box, according to the government, is the same address which was used on the amended tax returns for Harvey and Siti Z. Goldstein as charged in Counts 3 and 4 of the indictment.

b. In another letter, Chan was instructed by Strong, under the alias of Pedro, to mail two letters to the IRS with Hong Kong stamps and not a franking machine.

c. Another letter from Strong, using the alias of Pedro, questioned whether any checks had come in for clients of Pedro.

d. Chan also received instructions from Strong concerning the handling of a United States treasury check made payable to Leon Moore. The submission of fraudulent amended tax returns in the name of Leon and Dorothy D. Moore are charged in Counts 1 and 2 of the indictment.

6. Max Brown stated to the IRS investigator that he had received this information from Chan and also from examining documents in the files of Golden Trinity Limited and Puta Caliente in Hong Kong.

7. Brown declined to allow the IRS investigator to examine the corporate files and Chan declined to be interviewed or deposed with regard to these matters. Both Chan and Brown took the position that without an order from a Hong Kong court they would expose themselves to civil liability.

8. At the hearing on these motions, the government introduced into evidence, as government exhibits G–1 and G–2 respectively, the transcripts for the separate interviews of Shirley Chan and Max Brown conducted by the IRS investigator in Hong Kong in January and February, 1983.

**1.** At oral argument, counsel for defendant agreed that the facts as set out in the government's motions were accurate for purposes of considering the government's motions.

9. In June 1983, former Assistant U.S. Attorney Louis Ruch prepared a draft request for the assistance of the judiciary of Hong Kong to obtain access to the corporate files of Golden Trinity Limited and Puta Caliente, and to obtain the testimony of Chan. Ruch sought authorization from the Office of International Affairs in the criminal division of the Justice Department to apply for a court order requesting the issuance of the judicial request.

10. On August 15, 1983, in a written letter attached as Exhibit A to the government's reply memorandum of law filed on February 19, 1985, the Office of International Affairs advised that the Hong Kong court would most likely not cooperate with the request based on the needs of the grand jury, but would cooperate with the request after indictment.

11. For this reason, the government waited until after indictment to file the requests for assistance of the judiciary of Hong Kong.

12. In November of 1983, a grand jury subpoena was issued to Citibank in New York requesting the production of bank records for Russell and Catherine Strong at Citibank in Singapore.

13. In January of 1984, Citibank declined to produce the subpoenaed documents, citing the financial privacy laws of Singapore which prescribe criminal sanctions for disclosure of customer information contrary of the laws provisions.

14. In its January, 1984 letter, Citibank advised the government that it might wish to proceed by way of letters rogatory.

15. The government thereafter determined that a request for judicial assistance seeking these Citibank documents *before* indictment would not be successful and that it would be necessary to wait until *after* indictment to file the government's request for judicial assistance.

## DISCUSSION

The government's proposal to conduct foreign "discovery" through requests for judicial assistance creates several difficult issues of law concerning the power of the court to grant the government's requests and the Speedy Trial Act questions involved.

The government is asking this court to seek the assistance of the judiciaries of Hong Kong and Singapore in the production of certain evidence located in those nations. Specifically, the government desires me to ask the judiciary of Hong Kong to compel the deposition of Shirley Chan and the production of certain records she maintains on behalf of Golden Trinity Ltd. and Puta Caliente Ltd., both of which are Hong Kong corporations. It also asks me to request the judiciary of Singapore to compel the disclosure of certain banking records maintained at Citibank's Singapore offices.

The defendant argues that this court is without the power to grant the government requests, and that, in any case, the time necessary to comply with these requests should not be excluded under the Speedy Trial Act. I will address these arguments in turn.

The government has stated that there are two grounds for the court's power to issue requests for judicial assistance or letters rogatory to a foreign judiciary in a criminal case. First, it asserts that such power is inherent in a federal court. Second, it asserts that such power can be grounded more explicitly in Rule 57(b) of the Federal Rules of Criminal Procedure. I believe that both of these arguments have merit.

Rule 57(b) states:

If no procedure is specifically prescribed by rule, the court may proceed in any lawful manner not inconsistent with these rules or with any applicable statute.

Defendant has argued that there is a rule of criminal procedure that governs at least part of the government's request: Rule 15. That Rule allows the court to order that a witness be deposed "[w]henever due to exceptional circumstances of the case it is in the interest of justice that the testimony be

taken and preserved for use at trial." Defendant argues that this Rule should be read as providing the only means by which a deposition can be ordered in a criminal case. He further asserts that the government has not met its burden under this rule.

■ Without deciding whether the government has met the specific requirements of Rule 15(a), I think that the defendant's argument must fail. Rule 15 allows the court to order that a deposition be taken. Obviously, a United States court cannot order that a deposition of a foreign national be taken.[2] Defendant's argument to the effect that I can order that the deposition take place but that I lack the power to order Ms. Chan to attend or testify and that this result was the desire of the framers of the Rules is more than somewhat disingenous. The only realistic way of deposing a person who, like Ms. Chan, has previously refused to testify voluntarily is to enlist the aid of her national judiciary in order to compel the prospective witness to testify at the deposition consistent with any privilege she may viably assert at that time under the local law.

Defendant also makes a somewhat similar, more complicated argument based on the Federal Rules of Civil Procedure. Defendant argues that the framers of the Civil Rules have provided explicit means of conducting a foreign deposition. This fact, coupled with Rule 15's failure to provide a means to take foreign depositions, leads defendant to conclude that Congress made the affirmative decision to remove the power to order or seek foreign depositions in a criminal case. I believe that this argument misinterprets the relevant Rule of Civil Procedure and misreads Congressional intent.

In Federal Rule of Civil Procedure 28(b), a series of procedures is set out for the taking of a deposition in a foreign nation. That rule, however, does not purport to be the basis of an American court's power to issue a letter rogatory or a commission. Rather, it is clearly designed to set up a limited number of requirements for the taking of such depositions. It is not the basis of the court's substantive power, but rather sets out a certain means by which that power can be utilized.

The power of a court to transmit a letter rogatory is governed, at least in part, by 28 U.S.C. § 1781 which states:

(a) The Department of State has power, directly, or through suitable channels

. . . .

(2) to receive a letter rogatory issued, or request made, by a tribunal in the United States, to transmit it to the foreign or international tribunal, officer, or agency to whom it is addressed, and to receive and return it after execution.

(b) This section does not preclude

. . . .

(2) the transmittal of a letter rogatory or request directly from a tribunal in the United States to the foreign or international tribunal, officer, or agency to whom it is addressed and its return in the same manner.

This section, although not explicitly stating that a court has the power to issue a letter rogatory, recognizes the power of the Department of State to transmit such a request from a court of the United States to a foreign court and to receive and transmit back that response from the destination

---

**2.** Defendant relies on *United States v. Johnpoll,* 739 F.2d 702 (2d Cir.1984) in his argument that Rule 15 provides the sole mechanism for the taking of a deposition in a criminal case either in this country or abroad. In *Johnpoll,* the district court allowed the government to depose a number of witnesses who were citizens and residents of Switzerland. The Second Circuit affirmed the trial court's decision to allow the taking of these depositions under Rule 15. *Id.*

at 708–709. *Johnpoll* is distinguishable from the instant case, however, because it appears that the witnesses deposed therein willingly came forward to be deposed. In the instant case, Chan has refused to voluntarily give to the government the information it now seeks. Moreover, the *Johnpoll* court noted that the witnesses had to be deposed because they were not amenable to process and could not be compelled to testify at trial. *Id.* at 709.

court. It also states explicitly that the power of a court to transmit or receive such letters remains intact. 28 U.S.C. § 1781(b)(2).

Defendant argues that Civil Rule 28 and Criminal Rule 15 should be read together as evidence of the affirmative Congressional desire to prevent a court from exercising the power to enlist the aid of a foreign judiciary in compelling a foreign deposition. I think that the simple answer to this contention is that it reads too much into the silence of Congress. I cannot conclude, based on the available rules and statutes, that Congress intended to allow for the taking of evidence abroad in civil cases, but not in criminal cases. If this were the Congressional intent, it would have been a simple matter to make it explicit in either Rule 15 or 28 U.S.C. § 1781.

Defendant argues vigorously that 28 U.S.C. § 1781 applies only to civil cases. In support of that assertion, he points to the Hague Convention for the Taking of Evidence Abroad in Civil or Commercial matters, 23 U.S.T. 2555, T.I.A.S. No. 7444. That Convention was entered into by the United States in 1972 and governs the taking of evidence from abroad among its signatory nations. The United States, Singapore, and Great Britain, including its colonies, are signatories. The defendant would read the Convention as repealing or modifying the powers set forth in 28 U.S.C. § 1781 because it provides certain specific procedures for the taking of evidence abroad. I cannot accept this interpretation of the effect of the Convention. First, the Convention is procedural and not substantive. It does not purport to provide the courts of any nation with more power than they already have, nor to limit their existing power with regard to their *ability* to take evidence abroad. Second, the fact that the Convention applies on its face only to civil or commercial matters should not lead to the conclusion that there exists no means to gather evidence abroad in a criminal case through the use of letters rogatory. There has been an explosion of civil litigation involving foreign entities in recent years, and the Convention was de-signed to provide some uniformity to the means by which evidence in those cases could be gathered. Finally, if I were to accept the defendant's arguments in this regard, I would, in effect, be concluding that a court cannot proceed through letters rogatory or other means to obtain evidence from abroad unless the Convention and its procedures applies. This conclusion is untenable because the Convention as it presently stands has been signed by relatively few countries. I cannot view the Convention as limiting the powers conveyed by statute in such a manner.

Moreover, it has been held that federal courts have the inherent power to issue requests for judicial assistance through letters rogatory. In *United States v. Reagan*, 453 F.2d 165, 172–73 (6th Cir.1971), the court stated:

> The opinion of the Court of Appeals in *In Re Pacific Ry. Comm'n.*, 32 F. 241 (Cir.Ct.N.D.Cal., 1887), is suggestive though not squarely in point. There the Court held that the Pacific Railway Commission created by Act of Congress did not have the power to issue letters rogatory. Speaking of this instrument, the Court stated:
>
> > There are certain powers inherent in all courts. The power to preserve order in their proceedings, and to punish for contempt of their authority, are instances of this kind. And by jurists and text writers the power of the courts of record of one country, as a matter of comity, to furnish assistance, so far as is consistent with their own jurisdiction, to the courts of another country, by taking the testimony of witnesses to be used in the foreign country, or by ordering it to be taken before a magistrate or commissioner, has also been classed among their inherent powers. "For by the law of nations," says Greenleaf, "courts of justice of different countries are bound mutually to aid and assist each other, for the furtherance of justice; and hence, when the testimony of a foreign witness is necessary, the court before

which the action is pending may send to the court within whose jurisdiction the witness resides a writ, either patent or close, usually termed a letter rogatory, or a commission *sub mutuae vicissitudinis obtentu ac in juris subsidium,* from those words contained in it. By this instrument the court abroad is informed of the pendency of the cause, and the names of the foreign witnesses, and is requested to cause their deposition to be taken in due course of law, for the furtherance of justice, *with an offer on the part of the tribunal making the request to do the like for the other in a similar case."* Treatise on Evidence, vol. 1, § 320. The comity in behalf of which this power is exercised cannot, of course, be invoked by any mere investigating commission, 32 F. at 256, 257. (Emphasis added.)

(quoting *In Re Pacific Ry. Comm'n.,* 32 F. 241, 256–57 (Cir.Ct.N.D.Cal.1887).

■ The *Reagan* court approved the issuance of a request for judicial assistance in a criminal case before the indictment had been returned based upon an *ex parte* proceeding. The facts of the instant case are different, but make for a stronger argument that the requests as proposed are proper. The defendant in the present case has had a full opportunity to argue his case regarding the power of the court to issue such requests and the propriety of the requests framed. Moreover, the defendant has already been indicted; the government cannot be said to be on a "fishing expedition" here. I have reviewed the reasoning of the *Reagan* court and find it compelling. *Reagan* relies, in turn, on well established precedents stretching back to the words of Chief Justice Marshall in *Osborn v. Bank of the United States,* 22 U.S. (9 Wheat.) 738, 819, 6 L.Ed. 204 (1824). I find it to be a correct statement of the law regarding the power of a federal court to issue a request for judicial assistance in criminal cases. *See also United States v. Staples,* 256 F.2d 290, 292 (9th Cir.1958).

My decision that this court does have the power to issue the requests for assistance does not dispose of the present controversy. Obtaining the information the government seeks from Hong Kong and Singapore might conceivably take more time than is allowed to bring a defendant to trial under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* ("Act"). Defendant has been indicted and is awaiting trial. In order for the requests to proceed and for the requested information to be received, some exclusion of time must be made under the Act. The government has proposed that time may be excluded under three separate provisions of the Act: § 3161(h)(1)(F) (dealing with the exclusion of time for pretrial motions); § 3161(h)(3)(A) (dealing with the unavailability of an essential witness), and § 3161(h)(8)(A) (exclusion in the interests of justice). The defendant argues that none of these provisions allows for the exclusion of time for the processing of these requests.

At argument on this matter, the government admitted that the pretrial motions exception would allow for the exclusion of time from the time of the "filing of the motion through the conclusion of the hearing on, or other prompt disposition" of the motion and that this exception could not be used to exclude time from the granting of the instant requests until the time in which the requests are received back from Hong Kong or Singapore.

The second exception urged by the government would apply to only one part of one of the instant requests: that dealing with the deposition of Shirley Chan. The government claims that she is an essential witness within the meaning of the Act and that she has made herself unavailable. There can be little dispute that Chan is "unavailable" as that term is defined in § 3161(h)(3)(B). The defendant argues, however, that Chan is not essential to the government's case and that her testimony and the material of which she is custodian would be mere "icing on the cake."

■ An essential witness is one that is "extremely important to the proceeding,

perhaps providing proof that was not otherwise attainable." *United States v. Marrero*, 705 F.2d 652, 656 (2d Cir.1983) (citing S.Rep. No. 1021, 93rd Cong. 2d Sess. 37 (1974)). Chan was a business associate of the defendant in Hong Kong. In her position with Golden Trinity Ltd., she had the occasion to maintain the corporate records of Puta Caliente Ltd., a corporation which was allegedly formed by the defendant. Moreover, Puta Caliente was the registered owner of a post office box in Hong Kong to which certain of the tax refund checks involved in this case were directed. Certain of the tax refund checks were also directed to 1402 Tung Wah Mansions, Hong Kong. That is the address of Golden Trinity Ltd. Although the government has obtained some of the information Chan holds, it claims that much of the information it has is in the form of hearsay statements from Max Brown, another business associate of defendant. The government also asserts that Chan was directed to open the post office in question by someone who was identified as "Pedro." Pedro is an alleged alias of defendant Strong. The government claims that Chan alone can provide admissible testimony regarding this post office box and how it came to be opened.

■ Clearly, Chan is an important witness to the government's case. It is true that the government's case would be substantially impeded if Chan's testimony were unavailable. I also believe that the information in the hands of Chan may be the only admissible form of certain information. At this stage of the proceedings, I cannot speculate as to whether a jury would fail to convict Strong if Chan did not testify. I do not have a crystal ball, nor do I have a complete picture of the evidence in the government's possession. I believe, however, that Chan is "extremely important" to this proceeding and that a jury would not be fully able to evaluate the entire case against Strong without her testimony. I therefore conclude that at least as to part of the government's requests, the time needed to depose Chan is excludable under § 3161(h)(3)(A).

■ The government argues that the remainder of the time needed to process the requests for assistance is excludable under § 3161(h)(8)(A) which states:

(h) The following periods of delay shall be excluded ... in computing the time within which the trial of any such offense must commence:

. . . .

(8)(A) Any period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial. No such period of delay resulting from a continuance granted by the court in accordance with this paragraph shall be excludable under this subsection unless the court sets forth, in the record of the case, either orally or in writing, its reasons for finding that the ends of justice serve by the granting of such continuance outweigh the best interests of the public and the defendant in a speedy trial.

Under this section, I must evaluate a number of factors to determine whether, on balance, the interests of justice served by the continuance would outweigh the best interests of the public and the defendant in a speedy trial. These factors "among others" are:

(i) Whether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice.

(ii) Whether the case is so unusual or so complex; due to the number of defendants, the nature of the prosecution, or the existence of novel questions of fact or law, that it is unreasonable to expect adequate preparation for pretrial proceedings or for the trial itself within

the time limits established by this section.

(iii) Whether, in a case in which arrest precedes indictment, delay in the filing of the indictment is caused because the arrest occurs at a time such that it is unreasonable to expect return and filing of the indictment within the period specified in section 3161(b), or because the facts upon which the grand jury must base its determination are unusual or complex.

(iv) Whether the failure to grant such a continuance in a case which, taken as a whole, is not so unusual or so complex as to fall within clause (ii), would deny the defendant reasonable time to obtain counsel, would unreasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government the reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

No continuance under this section can be granted because of the lack of diligent preparation on the part of the government's attorney. 18 U.S.C. § 3161(h)(8)(C).

█ I cannot say at this juncture whether a failure to grant the continuance would result in a miscarriage of justice. I can say, however, that it would result in the government being forced to try this case without being fully prepared and without being able to produce certain highly probative evidence. It would also force the government to rely on testimony which at this early stage would appear to be inadmissible hearsay. As I will discuss more fully below, I believe that the government has been forced into this position by forces beyond its control and not because of a lack of due diligence.

This case is certainly complex, it involves allegations of an elaborate scheme to defraud the United States government and involves American citizens presently living in at least three far eastern nations, as well as a number of foreign nationals. More-over, the charges involve records and information that are difficult to discover without an existing criminal indictment.[3] Although there is only one defendant involved in this case and the indictment sets out only five counts, the factual theory behind those counts involves the flow of money from the United States to Hong Kong, then to California, then to Texas, and finally to Singapore. Obviously, the investigation of this alleged scheme was not simple. Indeed, the very motions presently before me demonstrate that the issues in this case are complex and novel.

Defendant argues that the government should have proceeded to extract the information it now seeks before the indictment was returned. Obviously, had it done so, the present Speedy Trial Act problems would not have arisen. The government responds to this argument by asserting that it proceeded with all possible diligence but that the exigencies of international law forced it to wait until after the indictment to seek the requests for assistance.

During the early stages of the investigation in this matter, the government became aware of the importance of Chan and the records she controlled. It attempted to obtain Chan's voluntary cooperation. She refused based in part on her reading of Hong Kong corporate privacy laws. The government drafted a request for judicial assistance and submitted that request to the Office of International Affairs in the Criminal Division of the Justice Department for review. In August, 1983, the Office of International Affairs advised the government's counsel in this matter that it would be unlikely that the government of Hong Kong would grant the requests before an indictment had been returned. This assessment was based on caselaw from Great Britain and Hong Kong.

The power of the government of Hong Kong to act on letters rogatory is based on Chapter 8 of that nation's Evidence Ordinance which in turn is derived from Great Britain's Evidence (Proceedings in Other

**3.** *See infra* at p. 196–197.

Jurisdictions) Act of 1975. That statute allows for the issuance of letters rogatory after "proceedings have been instituted." The House of Lords has interpreted that language to require the return of an indictment or information before the letters can issue. *See Rio Tinto Zinc Corp., et al. v. Westinghouse Electric Corp.*, [1978] 1 All. E.R. 434. The Supreme Court of Hong Kong has interpreted its Evidence Ordinance in conformity with the English courts' interpretation of the Evidence (Proceedings in other Jurisdictions) Act. *See In the Matter of Grand Jury Proceedings in the United States District Court, Southern District of California No. 82/141*, M.P. No. 168, slip op. (Hong Kong, April 28, 1983).

Similarly, the government attempted to obtain the information from the Singapore branch of Citibank early in the investigation by way of a grand jury subpoena. Citibank's New York legal counsel refused to produce the records so subpoenaed. The basis for this refusal were the Singapore Bank Privacy laws which in Citibank's opinion prevented the release of the information. Citibank suggested that the government proceed by way of letters rogatory.

I conclude that under the constraints in which the government operated before the indictment, its investigation was conducted with due diligence.

The defendant obviously has an interest in seeing the earliest possible resolution of this case as do all criminal defendants. The public shares that interest. I think that under all the circumstances of this case, however, the interests of the public and the defendant in a speedy trial are outweighed by the countervailing factors militating in favor of a continuance. If I were to refuse to grant such a continuance, it would be tantamount to concluding that the government could never proceed by way of letters rogatory in countries like Great Britain and Hong Kong which require an indictment before their courts will heed a foreign request for assistance. I do not consider this result to be desirable from the standpoint of the administration of justice.[4] I will therefore grant the government's motion and allow it to proceed to issue letters rogatory to the judiciaries of Hong Kong and Singapore. I will also exclude the time required to receive this information under 28 U.S.C. § 3161(h)(8)(A).

## CONCLUSIONS OF LAW

1. This court has the power to seek the assistance of the judiciary of Hong Kong and Singapore in the production of evidence in this case.

2. The government's applications to this court requesting the court to seek the assistance of the judiciaries of Hong Kong and Singapore are proper.

3. The evidence sought in those requests is important to the government's case. The deposition of Shirley Chan is necessary and proper to the government's case.

---

4. The defendant has argued that the government has not shown that the procedures it intends to follow are likely to produce the desired results. He has asserted that the privacy laws of Singapore would prevent the disclosure of the information sought from Citibank. Legal counsel for Citibank, however, apparently felt otherwise when they advised the government to proceed by way of letters rogatory. Moreover, defendant's reliance on Singapore's reservations under the Hague Convention is misplaced. In its acceptance of the Convention, Singapore states that it will interpret the "reference to civil or commercial actions in the Convention" to not include tax matters for the Republic of Singapore. 28 U.S.C.A. § 1781 note (Supp.1985) at 101. At best, this statement is ambiguous. I have already concluded, however, that the Hague Convention only applies to civil or commercial matters. Indeed, this conclusion is a lynchpin of one of defendant's arguments. I do not consider Singapore's reservations in the Hague Convention to be dispositive of the issue whether Singapore will respond to the requests with the information the government seeks. The government has represented that it believes that the requests will be successful based on the Office of International Affairs' experience in this area. The defendant has not referred me to any authority which would lead me to a contrary conclusion. I therefore conclude that the government has a reasonable chance to obtain this information through the means it wishes to employ.

198

4. Based on the available evidence of record, I conclude that Shirley Chan is an essential witness within the meaning of 18 U.S.C. § 3161(h)(3)(A).

5. The government has proceeded with due diligence in its investigation of this case.

6. The ends of justice served by granting the government's request for a continuance outweigh the best interests of the public and the defendant in a speedy trial because the failure to grant a delay would deny the government the reasonable time necessary under the circumstances of this case for effective preparation, because this is a complex case, and because the failure to grant such a delay would deny the government the evidence needed to prove Strong's involvement in the crimes charged.